JOSEPH W. PERRINE and JULIA A. PERRINE,

Complainants Below, Appellants,

MATHILDA J. FELDMAN, a stockholder of the Pennroad Corporation,

Objectant Below, Appellant,

*vs.*

THE PENNROAD CORPORATION, a corporation of the State of Delaware, THE PENNSYLVANIA RAILROAD COMPANY, a corporation of the Commonwealth of Pennsylvania,

Defendants Below, Appellees.

*Supreme Court, On Appeal, May 10, 1946.*

RICHARDS, C. J., SPEAKMAN, TERRY and CAREY, JJ., sitting.

*James R. Morford* (of Marvel & Morford), of Wilmington, and *Morris Wolf* (of Wolf, Block, Schorr & Solis Cohen), of Philadelphia, Pa., for petitioner, Pennroad Corporation.

*James M. Tunnell, Jr.*, of Georgetown, and *Joseph B. Keenan* and *Robert T. Murphy*, both of Washington, D. C., for complainants.

*Stewart Lynch*, of Wilmington, and *Leo Brady* and *Norman Keller* (of Gordon, Brady & Keller), of New York City, for Mathilda J. Feldman and other objecting stockholders.

*James H. Hughes* and *Max Terry*, both of Dover, for Norman C. Norman, intervenor.

*Maurice B. Blumenthal* and *Daniel W. Blumenthal*, both of New York City, for Pennroad Stockholders Protective Committee.

*Charles H. Tuttle* (of Breed, Abbott & Morgan), of New York City, for Pennroad Investors Committee.

*Archibald C. Palmer* and *Bennett E. Aron*, both of New York City, and *Ernest V. Keith*, of Dover, for Edward S. Birn and Louis Elion, stockholders of the Pennroad Corporation.

RICHARDS, Chief Justice, delivering the opinion of the court:

Joseph W. Perrine and Julia A. Perrine filed their bill of complaint in the Court of Chancery of this State, in and for New Castle County, on or about the fifteenth day of October, 1932, on behalf of themselves and also on behalf of all other stockholders and holders of voting trust certificates issued in connection with the stock of the Pennroad Corporation, a corporation of the State of Delaware, one of the defendants, in their said bill of complaint, the other defendants named in said bill of complaint being The Pennsylvania Railroad Company, a corporation of the Commonwealth of Pennsylvania, William W. Atterbury, Effingham B. Morris, Jay Cooke, Levi L. Rue, Richard B. Mellon, Albert J. County, Henry H. Lee, Joseph Wayne, Jr., and

A. H. S. Post; and Effingham B. Morris, William M. Potts and Joseph Wayne, Jr. as voting trustees under voting trust agreement dated May 1, 1929 in respect of the common stock of the Pennroad Corporation, a corporation of the State of Delaware.

Said bill disclosed that on February 28, 1920 an amendment to the *Interstate Commerce Act*, 49 *U.S.C.A.* § 1 *et seq.*, was passed which authorized and directed the Interstate Commerce Commission to prepare and adopt a plan for the consolidation of the railway properties of the continental United States into a limited number of systems; that on August 3, 1921 said Interstate Commerce Commission in pursuance of said amendment promulgated a tentative plan for the consolidation of said railway properties, providing for nineteen railway systems in the United States, and made certain allocations of railway properties to and among the railway systems provided for; that on April 24, 1929 the defendant, Pennsylvania Railroad Company caused to be incorporated the defendant, Pennroad Corporation, in the nature of an investment trust, with an authorized capital stock of 10,000,000 no par common shares, and with authority among other things to purchase and acquire securities of railroad corporations; that for the purpose of securing and maintaining control of said defendant Pennroad Corporation, the defendant Pennsylvania Railroad Company caused the defendants Atterbury, Cooke, County, Morris, Mellon, Rue, Lee and one Ingersoll, since deceased, to be selected as the first board of directors of the defendant Pennroad Corporation and acting in conjunction with said defendants caused the defendant, Pennroad Corporation, on or about May 1, 1929, to enter into a voting trust agreement with the said defendants, Atterbury, Morris and Cooke as voting trustees and in addition thereto illegally caused said defendant Pennroad Corporation to issue and deposit with said voting trustees all of the shares of stock of said defendant Pennroad Corporation, originally authorized to be issued, amounting to 5,800,000

shares, said voting trust under the terms of the agreement to continue for a period of ten years from May 1, 1929, and said stock to be voted by said voting trustees and their successors during said period; that on December 9, 1929 said Interstate Commerce Commission after lengthy hearings on the tentative plan above referred to, formulated and adopted a final plan for the consolidation of the railway properties in the eastern territory of the United States; that for some time prior to the passage of said amendment to the *Interstate Commerce Act* the four principal railway systems in the territory north of the Ohio River and east of the Mississippi River, including New England, were the Pennsylvania, New York Central, Baltimore and Ohio and the Chesapeake and Ohio, and these four systems were retained in said final plan but a fifth system was included therein which was built around the Pittsburgh and West Virginia Railway Company, the Wabash Railway Company, the Lehigh Valley Railroad Company and the Seaboard Air Line Railway Company; that the defendant, Pennsylvania Railroad Company, and the defendant directors above referred to, caused the defendant Pennroad Corporation, to offer for sale to stockholders and employees of the defendant Pennsylvania Railroad Company, voting trust certificates representing 5,800,000 shares of said stock of the defendant Pennroad Corporation at a price of $15 per share, and that a number of said stockholders and employees of said defendant Railroad Company, and a large number of other persons who were not stockholders and employees of said defendant Pennsylvania Railroad Company subscribed for the whole amount thereof and paid to the defendant Pennroad Corporation a total sum of $87,000,000, receiving voting trust certificates signed by said voting trustees; that subsequently, in the year 1929, said defendant directors and the defendant Pennsylvania Railroad Company caused the defendant Pennroad Corporation illegally to issue to said voting trustees 3,290,000 additional shares of its capital stock, voting trust certificates

being sold to subscribers therefor at prices ranging from $16 to $17 per share and the defendant Pennroad Corporation received therefor $54,285,000; that none of the subscribers having voting trust certificates were parties to the voting trust agreement, and none of said subscribers ever received any certificates for shares of stock of the defendant Pennroad Corporation, said stock having been caused by the defendant Pennsylvania Railroad Company and the said defendant directors to be issued and delivered directly to said voting trustees before any of said stock was sold or paid for and before any of said voting trust certificates were offered for subscription; that the defendant Pennroad Corporation was incorporated as a mere sham or device to enable the defendant Pennsylvania Railroad Company, without cost or risk to itself, to purchase and acquire the securities which it was prohibited by law from acquiring, and otherwise to perfect said Pennsylvania Railroad Company's program and advance its own interests; that said voting trust agreement was caused to be executed by the defendant Pennsylvania Railroad Company solely for its benefit and in order that it might operate and control the defendant Pennroad Corporation; that said voting trust agreement was conceived and carried out in fraud upon the stockholders of the Pennroad Corporation by reason of the fact that the defendant Pennsylvania Railroad Company deliberately concealed from the said Pennroad Corporation stockholders the design and intention of the defendant Pennsylvania Railroad Company to cause said Pennroad Corporation to be operated in the interest of the defendant Pennsylvania Railroad Company without regard to the consequences to the Pennroad Corporation; that by the control exercised under said voting trust agreement the defendant Pennsylvania Railroad Company, in furtherance of its own program and against the interest of the Pennroad Corporation caused the Pennroad Corporation during the years 1929, 1930, 1931 and 1932 to purchase at high prices, with no true relation to investment values, in excess of 45,326

shares of the stock of Detroit, Toledo and Ironton Railroad Company, 10,000 shares of the common stock of the Lehigh Valley Railroad Company, 224,330 shares of the common stock of the Pittsburgh and West Virginia Railway Company, 4,485 shares of the common stock of the Rariton River Railway Company, 402,119 shares of the stock of the Seaboard Air Line Railway Company, 138,800 shares of the common stock and 1200 shares of the preferred stock of the New York, New Haven and Hartford Railroad Company, 173,822 shares of various classes of preference stock and 27,565 shares of common stock of the Boston and Maine Railroad Company, and many other securities which the defendant Pennsylvania Railroad Company desired to control for its own interest; that many of said securities so purchased had either never paid dividends or their dividend payments had been very irregular and uncertain for a number of years prior to their purchase by said Pennroad Corporation, and they were not of an investment character; that the defendant Pennsylvania Railroad Company caused the defendant Pennroad Corporation to pay out in the purchase of said securities an amount in excess of $115,000,000, to incur indebtedness in the excess of $37,500,000 to sell and dispose of securities of a high investment character of the approximate value of $2,000,000, and in connection with the issue of 3,290,000 shares of Pennroad Corporation stock to pay underwriting expenses and commissions in excess of $5,000,000 and advance without sufficient security to some of the corporations whose securities were acquired an amount in excess of $1,800,000; that at the time the securities above referred to were purchased by the defendant Pennroad Corporation the defendant Pennsylvania Railroad Company and the other defendants named in said bill were fully aware of the fact that said securities were not worth the amount paid for them by the defendant Pennroad Corporation, and by reason thereof that the defendant Pennroad Corporation suffered an enormous loss amounting to many millions of dollars; that said loss was not the result

of an erroneous exercise of honest business judgment but resulted from a deliberate attempt to benefit the defendant Pennsylvania Railroad Company at the expense of the defendant Pennroad Corporation and its stockholders.

The bill then prays that the defendant Pennsylvania Railroad Company and the other defendants named therein, who were responsible for the losses imposed upon the defendant Pennroad Corporation, be required to account for said losses and be held liable therefor.

The late Chancellor Wolcott heard two arguments and wrote opinions on questions involved in this bill. The first of which dealt with the question of constructive service under our statute and the rules of the Court of Chancery. *Perrine v. Pennroad Corporation,* 19 *Del. Ch.* 368, 168 *A.* 196. And the second dealt with the question of misjoinder of causes and multifariousness, 20 *Del. Ch.* 106, 171 *A.* 733.

No further action was taken in the cause until the petition for approval of the agreement of settlement was filed on or about March 16, 1945.

About seven years after this bill was filed in the Court of Chancery of this State two other stockholders of the Pennroad Corporation, one named Ione M. Overfield and the other named Grace Stein Wiegle, filed similar bills in the United States District Court for the Eastern District of Pennsylvania both of which were based upon facts substantially similar to the facts of this case, and both of which prayed for substantially the same relief that was prayed for in this case. These cases were heard together before Judge Welsh of the United States District Court, who after hearing a great volume of testimony held that the cases were barred by the Pennsylvania statute of limitations as to the individual defendants, but that the defendant Pennsylvania Railroad Company was liable for the entire amount of capital lost in one of the eight investment transactions brought out, also for the net profits received by defendant

Pennsylvania Railroad Company from the operation of the company in which the Pennroad Corporation had made the investment; and appointed three investment experts authorizing them to make a further inquiry concerning the other seven investments made by defendant Pennroad Corporation as to which testimony had been introduced. *Overfield v. Pennroad Corporation*, (*D.C.*) 42 *F. Supp.* 586. Said investment experts made a report to Judge Welsh and were examined in· open court concerning the manner in which they arrived at the various amounts set forth in said report. Thereupon Judge Welsh filed a supplemental opinion, (*D.C.*) 48 *F. Supp.* 1008, in which he found the defendant Pennsylvania Railroad Company liable to the complainants for four of the investments concerning which testimony had been introduced before him, and entered a judgment in favor of the complainants and against the defendant Pennsylvania Railroad Company, for $22,104,515.

Up to the time of the first opinion handed down by Judge Welsh the defendant Pennroad Corporation had taken no part in the trial of the case before him but had assumed the position of a neutral party. But after said opinion was rendered it changed its attitude by advancing $100,000 to pay the actual cost incurred by the suit up to that time and employed Morris Wolf, Esquire, of the Philadelphia bar to act as independent counsel for it and to advise it concerning its future course with respect to these suits.

The defendant Pennsylvania Railroad Company, likewise the complaining stockholders, took an appeal from the judgment entered by Judge Welsh in the United States District Court to the United States Circuit Court of Appeals for the Third Circuit. 113 *F. 2d* 6. The defendant Pennroad Corporation acted in conjunction with the complaining stockholders in this appeal to the United States Circuit Court of Appeals, and its counsel, Morris Wolf, Esquire, assisted Hon. Daniel O. Hastings, chief counsel for the complaining stockholders, in the prosecution of the suits be-

fore Judge Welsh in the United States District Court, throughout the proceedings in said United States Circuit Court of Appeals.

On December 28, 1944, a majority of the Judges who heard the cases on appeal to the United States Circuit Court of Appeals filed an opinion, *Overfield v. Pennroad Corporation*, (3 *Cir.*) 146 *F.* 2d 889, in which they decided that the judgment of the United States District Court in favor of the individual defendants should be affirmed, but that the judgment against the defendant Pennsylvania Railroad Company should be reversed on the ground that the claims were barred by the statute of limitations of the State of Pennsylvania.

A dissenting opinion was filed in the United States Circuit Court of Appeals by Judge Biggs in which he held that both the defendant Pennsylvania Railroad Company and the individual defendants were liable for the full amount of the losses sustained by the defendant Pennroad Corporation, with interest at six per cent.

The mandate of the Circuit Court of Appeals has not been issued to the District Court and the time for filing petition for a rehearing in the Circuit Court has been extended,

At this stage of the proceeding, some time in January 1945, the representatives of the defendant Pennsylvania Railroad Company and the representatives of the defendant Pennroad Corporation began to talk of settlement of all matters in dispute between them, and after a number of conferences between said representatives together with counsel representing the complaining stockholders, a settlement agreement was executed by defendant Pennsylvania Railroad Company and defendant Pennroad Corporation.

Under the terms of this agreement the defendant Pennsylvania Railroad Company is to pay defendant Pennroad

Corporation $15,000,000, subject to the approval of the Court of Chancery of this State.

Before said sum of $15,000,000 is paid, this suit must be settled in compliance with the laws of this State and the rules of the Court of Chancery.

Also before said sum of $15,000,000 is paid, the mandate of the United States District Court of Appeals in the *Overfield-Wiegle* suits must be issued to the United States District Court, the bill dismissed without costs, and the time for applying for a writ of certiorari must have expired.

The defendant Pennroad Corporation agrees to bring no other suits or make no other claims against the defendant Pennsylvania Railroad Company, or its directors, which are in any way connected with or growing out of the same subject matter which is included in the three suits now pending.

The defendant Pennroad Corporation further agrees to deliver releases to the defendant Pennsylvania Railroad Company, to the individual defendants named in the suits who are now living and to the estates of those who are deceased.

Said agreement further provides that if for any reason the contemplated settlement is not consummated there shall be no prejudice to any of the parties concerned by reason of the making thereof.

The defendant Pennroad Corporation then filed a petition in the Court of Chancery of this State, praying the Chancellor to enter an order for a hearing on the advisability of the approval of said settlement agreement, and that after such hearing said settlement agreement be approved and that he order it to be carried out.

After giving notice to the interested parties a hearing was conducted by the Vice-Chancellor in Wilmington, at which much testimony was taken; the witnesses being ex-

amined and cross-examined by the parties in favor of and opposed to the approval of said settlement agreement. In addition to the testimony of the witnesses a great many exhibits were admitted in evidence.

The Vice-Chancellor decided that the settlement agreement should be approved and the petitioner be authorized to carry it out. From his decision this appeal was taken.

We will not attempt to consider separately each one of the thirty-eight assignments of error, but will confine ourselves to a consideration of the questions presented at the argument.

The foregoing lengthy statement of the facts of this case seemed necessary in order that it might clearly appear what had transpired prior to the filing of the petition by the Pennroad Corporation in the Court of Chancery, praying for an approval of the settlement agreement.

This court is called upon to determine whether the Chancellor should have approved the settlement agreement and in effect bring about a dismissal of the bill originally filed, or whether he should have insisted upon a full and complete hearing of the cause as alleged in the bill and determine the questions involved upon the facts brought out.

The Pennroad Corporation presented its petition for an approval of the settlement agreement to the Chancellor on March 16, 1945, notice of which had been given to all counsel who had appeared in the Perrine case, including Mr. Keenan, who then represented Mrs. Perrine and appeared for her in the hearing which was subsequently held by the Vice-Chancellor. At the suggestion of Mr. Keenan an adjournment was taken until March 19, 1945 in order that further time might be had for consideration of the form of notice to be given to the interested parties to said hearing. On said date of adjournment the Chancellor ordered that a hearing be held before the Vice-Chancellor on Monday, April 23d, 1945, at ten o'clock in the forenoon.

And further ordered that notice of said hearing be mailed to each stockholder of the Pennroad Corporation appearing on its books at the close of business March 19, 1945, at the address there given, accompanied by a copy of the agreement of settlement and the petition filed for approval thereof, and to be mailed not later than March 31, 1945. Said notice was also ordered to be inserted in a newspaper of general circulation in the cities of Wilmington, Philadelphia, New York, Boston and Chicago between the dates of March 19 and March 31, 1945. In addition to the notice above referred to Pennroad Corporation was directed to furnish any party in interest, on application, a copy of said settlement agreement and the petition filed for the approval thereof.

We are unable to find anything in the settlement agreement or the petition to the Chancellor asking for approval thereof, both of which accompanied the notice to the stockholders, which was untrue or misleading. Both of these papers referred to the *Overfield* and *Wiegle* suits which had been tried in the United States District Court for the Eastern District of Pennsylvania, and the Perrine suit which was pending in the Court of Chancery in this State. The petition for approval of the agreement set forth in narrative form practically what had taken place to date in each of these suits. It did not contain an analysis of the opinion of Judge Welsh in the United States District Court or the opinion of Judge Goodrich and Judge Jones of the United States Circuit Court of Appeals, but that was not necessary in order to inform the stockholders what the situation was at that time. They were fully informed concerning what had transpired prior to that time in all three of the suits and given an opportunity to acquire any further information that they might desire. The contention has not been made that the notice did not comply with the rules and practice in the Court of Chancery and we think that the Chancellor was justified in dismissing the objections thereto.

The contention was also made that the Court of Chancery did not have jurisdiction to approve the settlement agreement in this case, and attention was called to the *Federal Rules of Civil Procedure,* 28 *U.S.C.A.* following *Section* 723c, which provide that "a class action shall not be dismissed or compromised without the approval of the court." *Rule* 23 (*c*).

It is admitted that the Court of Chancery of this State cannot by its decree dismiss the *Overfield* and *Wiegle* actions now pending in the United States District Court for the Eastern District of Pennsylvania, or take any action which will be binding on that court. But in a stockholders derivative suit such as this is, where the controversy has been settled, after full hearing, before some other court having jurisdiction, it is competent for the Court of Chancery to entertain a petition for approval of a settlement agreement such as the one filed in this case. And if after notice to the stockholders and a hearing of the cause, the Chancellor is satisfied that the settlement agreement is for the best interest of all the stockholders, he may order that said agreement be approved. So far as the *Overfield-Wiegle* actions now pending in the Circuit Court of Appeals are concerned, that court has already decided what shall be done with respect to them, and it must be assumed that the settlement agreement contemplates that the direction of that court will be complied with. In fact the settlement agreement provides that before the sum of $15,000,000 is paid, the mandate of the United States Circuit Court of Appeals shall go forward to the United States District Court for the Eastern District of Pennsylvania, the bill dismissed in accordance therewith, without costs, and the time for applying for a *certiorari* therefrom shall have expired.

The petition presented to the Chancellor asked him to approve a settlement agreement, and in order to determine whether said agreement should be approved he was not required to try the case which is to be settled. *Goodwin*

*v. Castleton,* 19 *Wash.* 2d 748, 144 *P.* 2d 725, 150 *A.L.R.* 859. In fact, practically the same case had been tried before Judge Welsh in the United States District Court and the Vice-Chancellor had before him the opinions rendered in the United States District Court for the Eastern District of Pennsylvania and the United States Circuit Court of Appeals, as well as the briefs filed in each court on both sides of the case. In addition thereto he heard the testimony of Senator Hastings who testified at some length as to all of the important facts brought out at the trial. He also heard the testimony of Mr. Wolf, who after he was engaged as special counsel by the defendant Pennroad Corporation read the complete record of the trial of the case in the United States District Court. He also testified concerning many important facts which were brought out at the trial. There is no ground for the contention that the Vice-Chancellor's refusal to admit all the evidence offered by the objectors concerning the merits of the *Perrine* case violated the Constitution of the United States and the Constitution of the State of Delaware, by denying to the objectors due process of law. In determining what this principle stands for we know of no better authority than the well known case of *Pennoyer v. Neff,* 95 *U.S.* 714, 733, 24 *L. Ed.* 565, in which the court in construing these words said "they then mean a course of legal proceedings according to those rules and principles which have been established in our systems of jurisprudence for the protection and enforcement of private rights." In *Anderson National Bank v. Luckett,* 321 *U.S.* 233, 64 *S. Ct.* 599, 606, 88 *L. Ed.* 692, 151 *A.L.R.* 824, the court said:

> "The fundamental requirement of due process is an opportunity to be heard upon such notice and proceedings as are adequate to safeguard the right for which the constitutional protection is invoked. If that is preserved, the demands of due process are fulfilled."

The Pennroad Corporation was incorporated on April 24, 1929, for the admitted purpose of purchasing and acquiring the securities of railroad and other corporations.

It is not denied that the defendant Pennsylvania Railroad Company caused the defendants Atterbury, Cooke, County, Morris, Mellon, Rue, Lee, and one Ingersoll, since deceased, to be selected as its first board of directors, and acting in conjunction with said directors caused it to enter into a voting trust agreement with the defendants Atterbury, Morris and Cooke as voting trustees, and caused to be deposited with said voting trustees all of the shares of stock, originally authorized to be issued, amounting to 5,800,000 shares; or that said voting trust agreement was to continue for a period of ten years from May 1, 1929. It is also admitted that during the years 1929, 1930, 1931 and 1932, while the above named parties were acting as directors, and during the continuance of said voting trust agreement, the Pennroad Corporation purchased in excess of 45,600 shares of the stock of Detroit, Toledo and Ironton Railroad Company, 10,000 shares of the common stock of Lehigh Valley Railroad Company, 224,330 shares of the common stock of Pittsburgh and West Virginia Railway Company, 4,485 shares of the common stock of Rariton River Railway Company, 402,119 shares of the stock of the Seaboard Air Line Railway Company, 138,800 shares of the common stock and 1200 shares of preferred stock of New York, New Haven and Hartford Railroad Company, 173,822 shares of the various classes of preference stock and 27,565 shares of the common stock of the Boston and Maine Railroad Company, and many other securities which the defendant Pennsylvania Railroad Company desired to control for its own interest. It appears, however, that none of the directors of the defendant Pennroad Corporation who executed the settlement agreement with the defendant Pennsylvania Railroad Company were directors of said defendant Pennroad Corporation at the time these purchases were made, except possibly Mr. Bovenizer. At the time of the execution of said settlement agreement the board of directors of the defendant Pennroad Corporation consisted of George W. Bovenizer, Herbert W. Goodall, Herbert A. Day, John H.

Mason, S. D. Townsend, F. Brain Reuter, Alexander J. Cassatt, Benjamin F. Pepper, Frank J. Thomas, Carroll Dunham, Daniel O. Hastings, Frederick C. Dumaine, and William T. Kilburn. These gentlemen were members of the board of directors at the time the settlement was first mentioned and continued to be when the agreement was finally executed. They were all aware that the amount of the judgment recovered in the United States District Court was $22,104,515. They were also aware of the fact that this judgment had been set aside by the United States Circuit Court of Appeals, making it necessary to ask for a reargument before the United States Court of Appeals or take a *certiorari* to the Supreme Court of the United States. This was the same board of directors which changed its neutral position after the first opinion of Judge Welsh in the United States District Court, to one of active participation in the trial of the cases before him, employed special counsel to represent the corporation, and advanced $100,000 to pay the actual costs of the litigation up to that time. It did not hastily decide to enter into the settlement agreement but made full investigation of the status of the cases at that time and considered carefully the possibilities for future recovery. They had the advice and counsel of Senator Hastings, who by reason of his long connection with the cases during the trial in the United States District Court and the Circuit Court of Appeals, was better able to advise them than any one else. They also had the advice and counsel of Morris Wolf, Esquire, who, after he was employed as special counsel, read the complete record and conferred with Senator Hastings concerning the best course to pursue. Both of these gentlemen are eminent members of the bar of unquestionable integrity. It nowhere appears that these directors were under the influence of the defendant Pennsylvania Railroad Company, and they were elected as directors by a large majority of the stockholders.

The *Delaware Corporation Law, Revised Code of* 1935, *Paragraph* 2041, provides that "the business of every cor-

poration * * * shall be managed by a Board of Directors," and under this provision the directors of Pennroad Corporation had authority to enter into this agreement of settlement, if they acted in good faith.

In the settlement of disputes in which corporations are interested, the directors of the corporation, who are its duly accredited managers, are called upon to exercise honest business discretion. If it appears that they acted honestly, they are not responsible for mere mistakes, and under such circumstances courts will not interfere with their action or attempt to assume their authority to act. This must necessarily be so, otherwise, the courts will be called upon to settle many business disagreements between the stockholders of corporations, which should be disposed of by the directors who, as a general rule, are chosen by a majority of the stockholders for that purpose. Wherever it appears that there is fraud or unfair dealing on the part of the directors in arriving at a settlement, the court will always take jurisdiction of the case and set aside any settlement arrived at by such means. *Karasik v. Pacific Eastern Corporation,* 21 *Del. Ch.* 81, 180 *A.* 604; *Winkelman v. General Motors Corporation,* (*D.C.*) 48 *F. Supp.* 490.

In the case of *Karasik v. Pacific Eastern Corporation, supra,* the Court of Chancery of this State had before it the question of the settlement of a suit before it and other pending suits brought by complaining stockholders in their derivative rights, to recover damages in behalf of the defendant corporation. The basis of these suits was that certain individual defendants and a partnership had so managed the assets of the defendant corporation that they wilfully and recklessly squandered and wasted many millions of dollars for which an accounting to the corporation was prayed for. While said suits were pending an offer of settlement was made which after consideration was accepted by the directors. It is true that this offer of settlement was submitted to the stockholders of Pacific Eastern Corporation

for approval or rejection, but the court expressly stated that there was no legal requirement that the stockholders should be called upon to express their wishes in the matter, and throughout the opinion treated it as a settlement by the directors. In that case the settlement involved the granting of general releases to the defendants, and a payment to the corporation of $450,000 in settlement of a claim for which it was contended a decree could be obtained in any one of the suits, for as much as $100,000,000. The objections made to the settlement in that case included most, if not all, of the objections made to this settlement. After referring the case to a master for a full investigation of the facts in dispute, the Chancellor approved the settlement.

In the case of *In re Ortiz' Estate*, 26 *Del. Ch.* 240, 27 *A.* 2d 368, 374, the Wilmington Trust Company, Executor of Alice duPont Ortiz, deceased, petitioned the Court of Chancery for approval of a proposed compromise of certain outstanding claims in favor of the estate.

After holding that the executor of a fraudulent transferor had the power to sue to recover the property transferred, for the purpose of paying the claims of creditors defrauded, where the estate was insolvent, the Chancellor further held that the court had jurisdiction to approve the settlement of such a claim. The following language found in the opinion is especially applicable to the case under consideration:

"When a court is called upon to approve a settlement and compromise of a pending litigation; or to authorize a trustee, or receiver, or other fiduciary having the right to apply to the court to make a settlement or compromise of claims that might become the subject of litigation; the court is not required to try all of the issues involved or to decide any of them on their merits. The court is only called upon to consider the nature of the claims and the nature of the possible defenses and the situation of the parties and exercise what may be called business judgment in determining whether the proposed compromise is reasonable in the circumstances."

There is no conflict between the principle laid down

in this case and the principle laid down in the case of
*Karasik v. Pacific Eastern Corporation, supra.*

The further objection is made to the approval of the
settlement that the amount thereof, namely, $15,000,000
is grossly inadequate. The argument was made in sup-
port of this objection that Judge Welsh, who was the only
Judge to consider the *Overfield* and *Wiegle* suits on their
merits, rendered a judgment in favor of the defendant
Pennroad against the defendant Pennsylvania Railroad; but
that the rule of damages which he announced is not sup-
ported by any authorities in this country. In determining
whether the agreement of settlement is fair from this stand-
point, it must be kept in mind that the amount of said
judgment rendered by Judge Welsh was $22,104,515, and
the amount offered in settlement thereof is $15,000,000,
being about two-thirds of the full amount of said judgment.
Here attention should again be called to the fact that at
the time this settlement agreement was executed the judg-
ment rendered by Judge Welsh had been reversed by the
United States Circuit Court of Appeals. Unless a reargu-
ment is obtained in that court or a *certiorari* taken to the
Supreme Court of the United States, it will be necessary
to try the *Perrine* case on its merits, accompanied by the
taking of much testimony and the usual amount of expenses
incident to such litigation. Much of the testimony taken
would necessarily be the same testimony taken in the
*Overfield* and *Wiegle* suits and there would be the pos-
sibility of an appeal being taken from whatever decree
might be rendered resulting in protracted litigation.

Good faith may always be brought in question where
it appears that the settlement of a dispute between stock-
holders of a corporation is so grossly inadequate that one
is required to reach the decision that the directors were
reckless and indifferent as to the rights of the stockholders
and did not exercise reasonable business judgment. *Kara-
sik v. Pacific Eastern Corporation, supra; Allied Chemical*

*and Dye Corporation v. Steel and Tube Co.,* 14 *Del. Ch.* 1, 120 *A.* 486.

When we consider the great length of time which was consumed in the trial of the *Overfield-Wiegle* suits in the United States District Court, the possibility that some of the necessary testimony which was introduced in those cases might not be available at the trial of the *Perrine* case in this State, the possibility of further delay occasioned by an appeal, and the unavoidable heavy costs of another trial, we cannot say that the settlement of a $22,104,515 judgment for $15,000,000 is so grossly inadequate that it shows bad faith on the part of the directors of a corporation who approve it. Considering again the question of whether the Vice-Chancellor should have heard the case on its merits, before determining whether the settlement agreement was a fair and reasonable one, the record discloses that he did hear much testimony from which he might well arrive at the conclusion that the outcome of the litigation was uncertain. Not only did he hear the testimony of Mr. Bidlingmeyer, who was the secretary of the Pennroad Corporation during the entire time the transactions complained of took place, but also the testimony of Mr. Pepper, the president of Pennroad Corporation and a member of the board of directors, the testimony of Mr. Ogden, vice-president of the Pennroad Corporation, the testimony of Mr. Goodall, Mr. Dunham, Mr. Mason, Mr. Bovenizer and Mr. Reuter, all members of the board of directors of Pennroad Corporation, and the testimony of Mr. Wolf, special counsel of the Pennroad Corporation, who had read the entire record of the hearing before the United States District Court. All of these witnesses testified very frankly and it is conceivable that the impression might be obtained that the directors of the defendant Pennroad Corporation in making the purchases complained of were carrying out the directions of the defendant Pennsylvania Railroad Company, and that the stockholders of the Pennroad Corporation understood this at the time they subscribed for their stock.

It is contended on behalf of the appellants, Edward S. Birn and Louis Elion, that the Vice-Chancellor erred in refusing to allow them to file objections to the approval of the settlement agreement or to give consideration to their objections, in refusing to allow them to participate in the hearings before him, and in refusing to hear argument by their counsel upon questions of law and fact relating to the issues before him. The record discloses that the hearing before the Vice-Chancellor began on April 23, 1945, when an adjournment was taken until April 25, in order to give all parties who desired to, an opportunity to file objections. In fact, the Vice-Chancellor directed that all objections should be filed before court convened on that date. Their attorney was present when the hearing began on April 23 and did not oppose the Vice-Chancellor's order or ask that longer time for filing objections be granted. No objections were filed on behalf of the appellants Birn and Elion within the time fixed by the Vice-Chancellor. After court had convened on April 25, Mr. Palmer, who represented Mr. Birn, made an oral statement in open court that Mr. Birn was a stockholder of Pennroad and wished to object to the settlement. The Vice-Chancellor refused to allow him to object to the settlement at that time or take any part in the proceedings before him, because his objections had not been filed within the prescribed time.

The well recognized principle that the conduct of a trial is largely within the discretion of the trial judge is not questioned. Can it be said that the Vice-Chancellor abused his discretion by refusing to allow these appellants to file objections at the time they desired to, or to allow their counsel to take part in the proceeding. We think he was well within his rights by fixing a time within which objections should be filed, otherwise he might have been constantly interrupted by applications to file objections, and the hearing might have continued for an indefinite time. The objections not having been filed the parties were not in court and he was, therefore, certainly justified in refusing

to allow their counsel to examine witnesses or take part in the proceeding.

The decree of the Chancellor that the settlement agreement be approved and the petitioner be authorized to carry it out is hereby affirmed.