156 A.2d 90 (1959)
Berdye KRINSKY, Appellant,
v.
Sarah H. HELFAND, Plaintiff-Below, Appellee, and
A. S. Gambee et al., Defendants-Below, Appellees.
Supreme Court of Delaware.
November 13, 1959.
Russell J. Willard, Jr., of Hastings, Taylor & Willard, Wilmington, for appellant, Berdye Krinsky.
Milton Paulson, New York City, and Irving Morris, of Cohen & Morris, Wilmington, for appellee, Sarah H. Helfand.
James M. Tunnell, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, for appellee, E. C. Rhoden, Joseph J. Kelly, Jr., of Spencer, Fane, Britt & Browne, Kansas City, Mo., of counsel.
William S. Potter, of Berl, Potter & Anderson, Wilmington, for appellees, National Theatres Inc., and Fox Midwest Theatres, Inc.
SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.
*92 WOLCOTT, Justice.
This is a stockholder's derivative action on behalf of National Theatres Inc., and its wholly-owned subsidiary, Fox Midwest Theatres, Inc. Both corporate defendants moved to dismiss the original complaint or, in the alternative, for a more definite statement. Inter alia, the motion to dismiss was based upon the Delaware three-year statute of limitations.
In December, 1957, the Vice-Chancellor ruled that the complaint should be stated more definitely, and withheld ruling on the defense of the statute of limitations, stating that it could be raised again after a more definite statement had been filed.
Thereafter, the plaintiff, in order to state the complaint more definitely, sought discovery by extensive interrogatories to which the defendant, E. C. Rhoden, objected. In the objections to the interrogatories Rhoden sought to raise the Delaware three-year statute of limitations as a defense. The court, however, ruled that the interrogatories must be answered and that the cause was not yet in posture for a ruling on the defense of the statute of limitations.
Thereafter, the cause proceeded by the answering of the interrogatories, the amendment of the complaint, and the filing of answers. At some time, negotiations for settlement commenced ultimately culminating in a stipulation of settlement dated March 30, 1959. The plaintiff thereupon petitioned the court for approval of the settlement and, on April 3, 1959, an order was entered directing a hearing on the settlement proposal on May 7, with notice of such hearing to be mailed to all stockholders on or before April 17. After the hearing on the settlement, the Vice-Chancellor entered an order approving the settlement and awarding plaintiff's counsel a fee of $100,000. From this order, Berdye Krinsky, a stockholder of National who appeared at the hearing in opposition of the settlement, appeals. To understand the appeal, it is necessary to summarize the salient features of the lawsuit.
While the action was instituted against some twenty-six individual defendants, officers and directors of the two corporations, the complaint was pressed almost exclusively against Rhoden as President and chief executive of National.
From the amended complaint it appears that the cause of action asserted is based upon the following alleged circumstances:
Prior to September, 1952, National was a wholly-owned subsidiary of 20th Century Fox-Film Corporation. In June, 1951, Fox was ordered by an anti-trust decree to divorce its business of exhibiting moving pictures from the business of producing them. Fox thereupon, in compliance with the decree, organized National as a Delaware corporation which thereupon became an independent exhibitor of moving pictures
*93 It is alleged that, thereafter, Rhoden exercised  and still exercised at the time of filing of the complaint  complete domination over National, and that all National's directors were his nominees and thus influenced in their decisions by him. Midwest, being a wholly-owned subsidiary of National, was likewise dominated and controlled by Rhoden.
The specific complaints for which recovery is sought are as follows:
1. That Rhoden acquired, during the period of his domination of National, various theatres and facilities which competed with Midwest, the subsidiary of National; that Rhoden made such acquisitions for a business owned by him and his family, and that such theatres and facilities so acquired would have been useful and profitable to Midwest in the conduct of its business operation;
2. That Rhoden, dominating National and Midwest, caused their personnel and facilities to be used for the benefit of his personal business without paying National and Midwest for such services;
3. That Rhoden caused Midwest's large buying power to be used to obtain licenses for the exhibition of motion pictures for his personal business on more favorable terms than he could otherwise have obtained; and
4. Finally, that Rhoden caused National or Midwest to lease properties owned by Rhoden's personal business on terms in excess of the fair market value of such leases.
Following the discovery obtained through the answers to interrogatories, settlement negotiations were entered into between plaintiff's counsel and counsel for Rhoden in the light of the disclosed facts which threw doubt on plaintiff's complete ultimate success in the lawsuit. These disclosed facts were as follows:
1. With respect to the charge of domination and control of National by Rhoden, it appeared that in 1952 Rhoden, for the first time, became a member of National's board. That board consisted of twelve directors, seven of whom were independent businessmen, not employees of National, but in fact engaged in other independent businesses. These seven directors, constituting a majority of the board, were in no way subject to control by National or Rhoden. Throughout, Rhoden and his interests owned a maximum of 4% of National's stock. At the most recent meeting of stockholders of National, Rhoden was not reelected a director. These facts convinced plaintiff's counsel that the fundamental basis of the complaint, viz., Rhoden's domination and control of National and Midwest, was, if not non-existent, at least extremely doubtful.
2. With respect to the charge that Rhoden acquired properties for his own business which would have been useful to National and Midwest, discovery elicited the facts that, under the terms of the anti-trust decree, National and Midwest were prohibited from acquiring such properties. Furthermore, it was apparent that full disclosure was made by Rhoden to National's officers and directors of all of the properties owned by his personal business at the time he entered into several employment contracts. Such facts threw considerable doubt upon the charge of secret profiting by Rhoden at the expense of National and Midwest, and of the taking to himself of corporate opportunities.
3. With respect to the charge that Rhoden caused the facilities and personnel of National and Midwest to be used for the benefit of his personal business without charge, the facts demonstrated that, while such personnel and facilities were used, full consideration was paid by Rhoden's personal business to National and Midwest.
4. As to the charge that Rhoden caused National and Midwest to enter into unprofitable leases of theatres and facilities owned by Rhoden's personal business, the facts demonstrate that of three such theatres, two are currently operated profitably by National and Midwest, and with respect *94 to the third of such theatres, the lease of it under the terms of the settlement agreement is adjusted and cancelled.
The settlement negotiations were conducted in the climate of a very weak factual case and under the serious threat of the legal defense of the Delaware statute of limitations as a bar to any of the claims, even though they could be substantiated with proof.
The settlement agreement finally reached provided substantially as follows:
1. The lease on the unprofitable theatre providing for a monthly rental of $1,666.67 until September 10, 1962 was cancelled and 50% of the rent payments made or accrued between December 1, 1958 and the date of cancellation were to be rebated. If the lease had been cancelled as contemplated by April 15, 1959, the saving to National arising from such cancellation would have been approximately $71,000.
2. The existing contract of employment between Rhoden and National was cancelled by the payment to Rhoden of a less sum than the contract called for amounting to a net saving to National of $50,000.
3. Options held by Rhoden on 69,000 shares of National's common stock were cancelled. At the time of the settlement agreement the difference between the option and market prices was approximately $200,000. There is a dispute between the parties as to the measure of value of the cancellation of Rhoden's stock options but, certainly, the release of National from the obligation of the options has some value to it. While that value may not be measurable in dollars and cents, it certainly is a material factor in considering the terms of the settlement.
4. Finally, the settlement agreement provided for the renewal and extension for a period of seven years of a lease of a parking lot adjacent to one of the most profitable theatres of the company. The value to the company of the renewal of the parking lot lease is estimated at $25,000 per year, or a total for the extended term of the lease of approximately $175,000.
The above outlined settlement was submitted to the Vice-Chancellor for his approval on the basis of the answers to the interrogatories and two affidavits, one by Rhoden and one by Richard P. Brous, President of Midwest, which affidavits supplied sworn evidence of facts in addition to those obtained from the answers to the interrogatories.
The Vice-Chancellor approved the settlement on the basis of his own knowledge gleaned from the course of the litigation; the uncontroverted facts disclosed by the answers to the interrogatories and the affidavits; his appraisal of the chances of ultimate success if the case went to trial, and, finally, upon the approval of the independent board of directors of National of the settlement, a factor which always is given great weight by the courts in passing on settlements of derivative stockholders' actions. Perrine v. Pennroad Corp., 29 Del.Ch. 531, 47 A.2d 479.
We have examined the record upon which the Vice-Chancellor's approval was based. Our function in the review of such matters is to determine whether or not under all the facts and circumstances the Vice-Chancellor abused his discretion in approving the settlement.
In determining whether or not to approve a proposed settlement of a derivative stockholders' action, it is not necessary for the court to try the issues of the case for the reason that any such requirement would defeat the purpose of settlement, itself. Braun v. Fleming-Hall Tobacco Co., Inc., 33 Del.Ch. 246, 92 A.2d 302. The court is called upon to consider and weigh the nature of the claim, the possible defenses, and to exercise business judgment in determining whether or not the proposed settlement is reasonable.
The Vice-Chancellor found this settlement to be reasonable and, accordingly, *95 approved it. We are of the opinion that there is sufficient evidence to support his finding which should therefore be affirmed.
A secondary issue raised by the appellant relates to the amount of fee allowed counsel for the plaintiff. The appellant argues that the amount of fee is so unreasonable in its relation to the value conferred by the settlement as to make it unconscionable.
Again, the fixing of fees is a discretionary act of the trial court and will be reversed only when such discretion has been clearly abused. We think the settlement's estimated value of approximately $500,000 is probably a fair estimate of value recovered for the corporations despite the attack made upon the estimate by the appellant. In any event, we do not think that appellant's piecemeal attack on the settlement's estimated value is so clearly right as to warrant us in assuming that the value is grossly inflated. On the contrary, with the possible exception of the value placed upon Rhoden's stock options, we think the value is demonstrably correct.
Accordingly, we think it proper for the Vice-Chancellor to have accepted $500,000 as the value of the benefit to the corporations and to have used this figure in determining the amount of fee to be awarded. He also properly considered the time and effort put into the lawsuit by counsel for the plaintiff, which were known to him by reason of the course of the litigation. Time and effort of counsel are, of course, major elements in the fixing of compensation. It was also quite proper for the Vice-Chancellor to give considerable weight to the fact that the amount of fee had been approved in advance of the settlement by an independent board of directors of National.
We think, therefore, that the order allowing fees to plaintiff's counsel must be affirmed.
There remain several minor points made by the appellant which we will now notice. First, appellant argues that the length of notice given to stockholders of the hearing on the settlement was insufficient. It appears that the mailing of the notice and the time set for the hearing were in accordance with the usual Chancery practice in the settlement of stockholders derivative actions. For example, in Perrine v. Pennroad Corp., supra, a notice to stockholders of twenty-three days was approved, and in Braun v. Fleming-Hall Tobacco Co., Inc., supra, a notice of twenty-five days was approved. The notice in the case at bar was actually twenty days, which we do not think is unduly short since it complies with the heretofore established practice in such matters.
Next, the appellant argues that the failure to disclose in the notice sent to stockholders the amount of fees requested should lead us to reverse the approval. The notice, however, clearly states that compensation for counsel would be requested and, under such circumstances, a duty is imposed upon protesting stockholders to obtain the details if they are interested. Braun v. Fleming-Hall Tobacco Co., Inc., supra.
Next, appellant argues that the prior approval of the board of directors of the amount of the fee is bad as against the public policy of the state. The answer to this is that it is customary for the boards of directors of the corporations involved to express their approval or disapproval of requested fees and, oftentimes, to agree in advance that they will not oppose the award of a fee in excess of a certain amount. As a matter of fact, the record discloses that it was due to the efforts of this independent board of directors that the requested allowances to plaintiff's counsel were cut down materially.
Next, appellant argues that the Vice-Chancellor abused his discretion in approving the settlement solely on the recommendation of counsel. The difficulty with this *96 argument is that it is not substantiated by the record. As we have pointed out, the Vice-Chancellor's approval of the settlement was based upon the facts.
Finally, appellant argues that the alleged benefits of the settlement do not exist. We find the argument difficult to follow since it seems to us that clearly the settlement conferred benefits upon National and Midwest. Her only possible contention in this respect would relate to the value placed upon the elements of the settlement, and if she makes such an attack it then becomes incumbent upon her to offer facts to demonstrate the inflated nature of the value. This, she has not done. In fact, she offered nothing below to substantiate the charge of over-valuation. Under the circumstances, we think her failure to do so must be taken as a practical admission that the estimated value of the settlement approximates its true value.
For the foregoing reasons, the judgment of the Vice-Chancellor is affirmed.