**Alexander PRINCE and Magda Prince, Plaintiffs,**

**v.**

**B. E. BENSINGER et al., Defendants.**

Court of Chancery of Delaware.

New Castle.

June 19, 1968.

William T. Lynam, III and Ernest S. Wilson, Jr., of Wilson & Lynam, Wilmington, and Stanley L. Kaufman of Kaufman, Taylor, Kimmel & Miller, New York City, for plaintiffs.

Robert H. Richards, Jr., and E. Norman Veasey of Richards, Layton & Finger, Wilmington, and Leo Herzel and William A. Wineberg of Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., for individual defendants.

John P. Sinclair of Potter, Anderson & Carroon, Wilmington, for defendant, Brunswick Corp.

Vincent A. Theisen of Theisen & Lank, Wilmington, and Thomas W. Hill, Jr., and Bruce J. Colan of Spear & Hill, New York City, for objectant, Colonial Realty Corp.

Jacob Cohen, Chicago, Ill., for himself and for June Cohen, objectants.

MARVEL, Vice Chancellor:

The complaint herein, which is derivatively filed by two stockholders of Brunswick Corporation, attacks the propriety of certain bonus payments made to the individual defendants and other key employees of the corporate defendant, said payments being attacked on the general ground of excessiveness and on the specific ground that they were computed on the basis of allegedly fictitious corporate earnings of some $140,000,000 reported by Brunswick

for the years 1961 and 1962. Such bonus payments were allegedly made under the provisions of a 1956 plan which authorized the annual setting aside by Brunswick's board of directors of up to 6½% [1] of such corporation's consolidated net profit before taxes as a bonus fund. Such plan further provided that a bonus could not be declared on the basis of pre-tax net profit in any year in which less than $1.00 should be earned per share on Brunswick's outstanding common stock plus the sum required to pay the annual dividend due on the corporation's preferred stock. In summary, the complaint charges that total compensation received by the individual defendants as well as by other eligible employees of Brunswick was in excess of the true value of such persons' services inasmuch as bonus payments were calculated on a false premise.

The complaint prays for relief in the form of repayment to Brunswick of the allegedly illegal compensation received by the individual defendants, the payment by them of Brunswick's other damages, the cancellation of deferred bonuses allegedly due certain of the individual defendants, the cancellation of unexercised stock options, and the invalidation of any stock issued pursuant to such stock option plans.

Brunswick Corporation is known nationally as one of the two leading manufacturers of bowling lanes and equipment. Recently it has established itself as one of the two leading manufacturers of machinery designed to set fallen pins automatically. The automatic pinsetter, which revolutionized the bowling business, was introduced in 1951 by Brunswick's chief competitor, American Machine and Foundry Company. Brunswick's version of such device was put on the market in 1956. Brunswick's sales thereafter sharply increased through the year 1961. In 1955 Brunswick's sales had totalled $98,593,000. By 1961 total sales had increased to $462,865,000. During the same period net earnings rose from $3,966,000 in 1955 to $44,982,000 in 1961. This period of prosperity, however, was followed by a sharp decrease in sales as the bowling market tended to become over-sold. Such decline is reflected in sales of $359,343,000 in 1962, of $314,-876,000 in 1965, and $344,648,000 in 1966. During the same period net earnings decreased from $24,307,000 in 1962 to a loss of $76,932,000 in 1965. However, this low point was followed by a recovery, net earnings of $3,129,000 having been reported for 1966.

Brunswick sells its equipment on the installment plan. On each such sale Brunswick has traditionally reported as accrued income the entire sale's price of each piece of equipment so marketed. And while purchasers of Brunswick's automatic pinsetters are required to make a down payment of $500, annual payments are thereafter made under terms of a conditional sale's contract at the rate of 12% per game bowled, the minimum annual payment required being fixed at $1,200 per machine plus interest at the rate of 6% per annum. Financing of sales is accomplished under an agreement with C.I.T. which is entitled to receive as security not less than 80% of Brunswick's installment obligations.

Basically, plaintiffs' case, stripped of non-essentials, is based on the proposition that because Brunswick's reported earnings for 1961 and 1962 were accrued rather than actually received in such years that the bonus payments made to the individual defendants and others were necessarily improper. As a result of pre-trial discovery, however, counsel for plaintiffs ascertained that the total of the bonuses actually paid out to the individual defendants during the years in question totalled the relatively modest sum of $400,000. Counsel also satisfied themselves, after examining the ap-

[1]. The percentages of such net profits actually paid out in the form of bonuses in 1961 and 1962 were, respectively, 1.86% and 2.54%.

propriate records, that Brunswick had not in fact overstated earnings in 1961 and 1962 in order to pay bonuses and that at the time of the filing of the complaint they had been mistaken about other matters complained of, such as Brunswick's treatment of delinquent accounts and reserves for bad debts. Counsel concluded that the difficulties posed by the task of persuading the Court to condemn Brunswick's long-established method of doing business were such that the chances of ultimate success were too slim to warrant going to trial, at least until settlement possibilities had been looked into. Discussions with counsel for the individual defendants thereafter undertaken resulted in a negotiated settlement for which Court approval is now sought after a duly noticed hearing.

The stipulation for settlement, the essentials of which are set forth in a notice to stockholders, states in substance that as part of the dismissal proposed, Brunswick had undertaken to terminate its 1956 employee bonus plan and to adopt a new incentive compensation plan. Such notice went on to state that such new plan, the terms of which were disclosed, would not be adopted until approved by the Brunswick stockholders at their annual meeting to be held on April 28, 1968. At the settlement hearing, held pursuant to notice, strong objection to the proposed dismissal of the action was made by the following stockholders of Brunswick, Colonial Realty Corporation and Mr. and Mrs. Jacob Cohen.

■ Colonial contends, first of all, that the proposed settlement should not be approved because the notice to stockholders not only contains material misstatements but also fails to disclose material facts. It is also claimed that such document was not drawn in a manner designed to put Brunswick's stockholders on notice concerning the actual facts. Colonial, in effect, seeks to have the notice in question tested by the stringent federal rules which govern the

use of prospectuses for marketing corporate securities. It is clear, however, that the courts of Delaware do not adhere to such rules when testing the sufficiency of notices of settlement hearings, Perrine v. Pennroad Corporation, 28 Del.Ch. 342, 43 A.2d 271, aff'd 29 Del.Ch. 531, 47 A.2d 479. A notice to shareholders of a settlement is not required "* * * to eliminate all occasion for initiative and diligence on the part of the stockholders * * *", Braun v. Fleming-Hall Tobacco Co., 33 Del.Ch. 246, 92 A.2d 302. Interested shareholders may acquire additional information concerning the status of a case proposed for settlement by an examination of the Court file, Braun v. Fleming-Hall Tobacco Co., supra, and Perrine v. Pennroad Corp., supra. The notice here in issue contained, as is customary, a statement that the file in question would be open for examination in Wilmington. Such notice also summarized the pleadings, the evidence, plaintiffs' position, the terms of settlement, and set forth the new bonus plan in its entirety. Finally, its effectiveness is evidenced by the appearance of the present objectants at the settlement hearing. I find that it complies with our Delaware requirements.

■ Turning to Colonial's basic objection, I conclude that the mere fact that Brunswick informed its stockholders that it relied on an accrual method of accounting, which the objectant Colonial considers inappropriate for a company such as Brunswick, is not a material misstatement of fact. Brunswick and Colonial merely differ as to what sort of accounting practices should be used by Brunswick and Colonial concedes that the accrual method of accounting is widely used by manufacturers. Next, reliance by Colonial on the case of Escott v. BarChris Construction Corporation (S.D.N.Y.1968) 283 F.Supp. 643, is misplaced, such case having dealt with materially misleading statements in a prospectus governed by the Securities Act of 1933 as opposed to a notice to stockholders con-

cerning the proposed settlement of a derivative action. Furthermore, an alleged misleading statement in the BarChris opinion to the effect that since 1955 such company had been required to repurchase less than ½ of 1% of discounted promissory notes of unaffiliated financial institutions, was in fact knowingly false because at the time it was made the directors of this small company knew that BarChris would soon be required to purchase all of the promissory notes of four of its leading customers. The comparable statement made by Brunswick reads as follows:

> "The evidence further reveals that in 1962 and prior years, Brunswick's reserves for losses on receivables were substantially in excess of realized losses since Brunswick's historical experience on losses was less than ¼ of 1%. At the end of 1962 Brunswick's reserves for losses on receivables equalled 3.9% of the principal amount of notes and accounts outstanding and its reserve for deferred income taxes amounted to 20.1% of the principal amount of notes and accounts outstanding."

■ I conclude that Brunswick's statement was not calculated to mislead stockholders into believing that corporate losses had remained at less than ¼ of 1% inasmuch as it went on to point out that 3.1% of bowling equipment receivables were delinquent. Furthermore, Brunswick has established that at the time in issue, it, in fact, transferred 4% of its receivables annually to its reserve for bad debts. It accordingly appears, as plaintiffs concede, that the charges made in the complaint are not sustained by the actual facts.

■ The Court's responsibility at this juncture is to determine whether or not the proposed settlement terms are fair, reasonable and adequate, a settlement hearing not being in any sense a rehearsal of a trial. See Rome v. Archer, 41 Del.Ch. 404, 197 A.2d 49, and Gladstone v. Bennett, 38 Del.

Ch. 391, 153 A.2d 577. In other words, the question now for decision is whether or not the terms of the settlement are fair and reasonable when weighed against the probability of recovery at trial on the asserted claims, Hoffman v. Dann, 42 Del. Ch. 123, 205 A.2d 343, cert. den., 380 U.S. 973, 85 S.Ct. 1332, 1337, 14 L.Ed.2d 269. In making this evaluation, the function of the Court is merely to determine such probability and to go no further. Dann v. Chrysler Corp., 41 Del.Ch. 438, 198 A.2d 185, and Krinsky v. Helfand, 38 Del.Ch. 553, 156 A.2d 90. Finally, the recovery of monetary damages from director defendants is not a sine qua non to settlement of a derivative action, Hoffman v. Dann, supra, and Nadler v. Bethlehem Steel Corp., 38 Del.Ch. 427, 154 A.2d 146.

■ Colonial nonetheless contends that there is a substantial probability of success at trial because it has already been preliminarily demonstrated that Brunswick's earnings were actually fictitious and overstated in 1961 and 1962 as a result of the individual defendants' use of improper accounting methods, namely the accruing of income, and because of their demonstrated failure to maintain adequate reserves for losses on bowling equipment receivables. And while Colonial concedes that the accrual method of accounting is used by most manufacturers making installment sales, it takes the position that the accrual method is per se improper in the case of Brunswick because the circumstances surrounding Brunswick's sales necessarily brought about an overstatement of income. Colonial seeks to equate Brunswick's business with that of a speculative real estate venture or the like, also contending that Brunswick deliberately sold to persons of doubtful financial stability. However, the facts of record are to the effect that Brunswick not only annually examined each account receivable but also that its losses over the years had historically been less than one quarter of one percent. In short, I am satisfied that even were Brunswick held to the strict federal

rules governing speculative enterprises, such corporation's practices as to down payments, financing, and collections were all within the guidelines established for testing the propriety of the business practices of such an enterprise.

■ Finally, apart from the fact that a substantial probability of success on the part of Colonial on its contention that the accrual method of accounting is improper for Brunswick's business has not been demonstrated, Colonial has made no attempt to establish the groundwork for its contention that the Brunswick directors knowingly overstated corporate earnings. Former 8 Del.C. § 144, relied on by Colonial, requires that to become liable, directors must knowingly publish a written false statement. On the other hand, former 8 Del.C. § 141(f), now 141(e), fully protects directors of a corporation where they rely in good faith on books of account and reports made by any of its officials, or by an independent certified public accountant. In fact, under Delaware case law, directors are not liable for mere good faith errors in judgment, Freeman v. Hare & Chase, Inc., 16 Del.Ch. 207, 142 A. 793, and directors, are, of course, presumed to have acted in good faith, Isaacs v. Forer, 39 Del.Ch. 105, 159 A.2d 295, Porges v. Vadsco Sales Corp., 27 Del.Ch. 127, 32 A.2d 148, and Karasik v. Pacific Eastern Corp., 21 Del. Ch. 81, 180 A. 604. Here, there is substantial evidence of record that the directors of Brunswick relied in good faith upon books and accounts, or reports prepared by Brunswick's accounting department as well as on the advice of its independent certified public accountants, Arthur Andersen & Co.

■ Turning to Colonial's contentions concerning the inadequacy of Brunswick's reserves for bad debts, it is pointed out that while Brunswick's historical loss on accounts receivable had for some time stood at less than one quarter of one percent, starting in 1960 reserves for bad debts were allowed to remain constant while business declined and the number of delinquent accounts receivable increased. Colonial argues that in view of these changes historical experience is irrelevant in determining the adequacy of reserves and offers as evidence several isolated instances of official recognition of the existence of problems in the bowling industry as early as 1960. Colonial also seeks to demonstrate that officials of Brunswick were aware of the fact that sales were not only increasing at a declining rate through 1961 but that they were thereafter actually declining in 1962. During this same period there was also recognition of increases in delinquent accounts receivable. Colonial concludes that inasmuch as Brunswick's management had knowledge of these facts, its directors could not help but have been aware of the fact that the net value of Brunswick's bowling receivables was deteriorating rapidly. However, as noted earlier, it is established that each account receivable was thoroughly examined each year not only by Brunswick but also by Arthur Andersen & Co. Furthermore, the Brunswick directors who testified at the settlement hearing concluded that reserves for bad debts were in fact adequate in 1961 and 1962, a conclusion confirmed by the independent accountants. Moreover, Colonial's reliance on the case of Vogtman v. Merchants' Mortgage & Credit Co., 20 Del. Ch. 364, 178 A. 99, is misplaced. In that case, the Chancellor, in evaluating the assets of a small loan company legally available for dividend purposes, found that there was, in effect, no reserve for bad debts maintained by the small corporation involved. The cited case is actually concerned with the question of the illegality of dividends allegedly paid out of capital as a result of an overvaluation of assets, and although the Court found that a 10% depreciation of loan accounts was reasonable under the circumstances, the case throws no light on the present problem of determining the adequacy of reserves of a multi-million dollar business.

Colonial also seeks to use the BarChris opinion as authority for the proposition that it was general knowledge in the trade that the bowling industry was saturated in 1961 and 1962 and that the individual defendants with such knowledge should have increased Brunswick's reserves for bad debts. However, saturation was mentioned in the opinion merely as background and was not related to the Court's holdings concerning overstated assets or the inadequacy of reserves. In fact, the court reviewed each account separately in determining if assets were correctly stated, the very same policy employed by Brunswick in evaluating its own reserves. Significantly, when the Court embarked on a discussion of the issue of the alleged inadequacy of reserves, it concluded:

"The amount of such reserve is a matter of accounting judgment. The evidence does not convince me that the accountant's judgment here was so clearly wrong that the balance sheet can be found to be false or misleading for lack of a higher reserve."

Finally, the second statement in Bar-Chris concerning deteriorating conditions in the bowling industry was made in connection with defendants' contentions that any damages suffered by the purchasers of certain BarChris debentures were not caused by materially misleading statements but rather by a general decline in the industry.

The Cohens, joined by Colonial, further object to the proposed settlement on the ground that no benefit will be conferred on Brunswick by the settlement, if it is approved, and assuming some benefit, the settlement bears no relation to the nature of the case as filed.

Turning to the genesis of the new bonus plan and plaintiffs' alleged contribution thereto, it appears that Brunswick had for some time been aware of the fact that its compensation for its officers and key employees was low compared to that of other comparable corporations, and was also aware of other flaws in its 1956 plan. For example, under the 1956 bonus plan the corporation was required to earn one dollar per share on its outstanding common stock before it could pay bonuses. However, no effort was thereafter made to adjust to the increase in outstanding shares of Brunswick by reason of stocksplits, the payment of stock dividends, and the issuance of stock to buy into other companies. Bonuses were thus reduced by reason of the dilution of Brunswick's outstanding stock. Accordingly, the corporation began a study of ways and means of improving its bonus plan so as to provide greater incentive to key employees and at the same time eliminate the more glaring faults of the existing plan, particularly the vice of having bonuses based on the separate performance of Brunswick's various divisions, the bowling division having outdistanced all others. To such plan, as finally drawn, plaintiffs contributed the following: provisions for an increase in the amount of corporate net worth required to authorized bonus payments; the placing of limitations on bonus payments to 100% of salary for recipients receiving salary of less than $50,000 per year and to 50% of salary of those receiving salaries of $50,000 or more, and the elimination of the corporations' three top executives from the list of bonus eligibles.

In the light of the obvious difficulties standing in the way of establishing the charges made in the complaint, I am persuaded that the proposed settlement should be approved. I am also satisfied that while Brunswick will not receive immediate tangible benefits upon approval of the proposed settlement, probable long term-benefits to the stockholders of Brunswick may properly be anticipated, Hoffman v. Dann, supra. An additional factor in favor of approval of the proposed settlement and eventual implementation of the new bonus plan is the affirmative vote of 59.76% of shares entitled to vote at Brunswick's annual meeting of stockholders held

on April 26, 1968. Voting against the plan were stockholders holding a mere 5.83% of the shares entitled to vote, Dann v. Chrysler, Corp., 41 Del.Ch. 438, 198 A.2d 185. Finally, I am of the opinion that the proposed settlement is sufficiently related to the charges made in the complaint, Dann v. Chrysler, supra, and Manacher v. Reynolds, 39 Del.Ch. 401, 165 A.2d 741.

The Cohen objectants, however, go on to argue that the proposed settlement must be disapproved because Brunswick has agreed not to oppose plaintiffs' application for a payment of $70,000 for their attorneys' fees and for their accounting expenses. However, objectants fail to distinguish between the purpose of a settlement hearing per se and the judicial act of determining the question of the extent of a plaintiff's contribution to a fair settlement. If the settlement is ultimately consummated, an evaluation of plaintiffs' contribution thereto will be made by the Court after a duly scheduled hearing, Treves v. Servel, Inc., 38 Del.Ch. 483, 154 A.2d 188, and Chrysler Corp. v. Dann (Del.Sup.Ct.) 223 A.2d 384.

On notice, an order may be presented approving the proposed settlement and dismissing the action.