Max **LEVINE** and Pennie **Levine,** Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent.

Jacob **DUBROVSKY** and Gertrude **Dubrovsky,** Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent.

Nos. 14281, 14283.

United States Court of Appeals Third Circuit.

Argued June 6, 1963.

Decided Oct. 29, 1963.

Martin D. Cohen, Newark, N. J. (Cohen, Rosenbaum & Scher, Newark, N. J., on the brief), for petitioners.

J. Edward Shillingsburg, Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent.

Before BIGGS, Chief Judge, and McLAUGHLIN and GANEY, Circuit Judges.

McLAUGHLIN, Circuit Judge.

In the sale of their fuel oil business, including real estate, the taxpayer owners claimed that its physical assets comprised

$50,000 of the $85,000 purchase price and that its gallonage good will amounted to the balance of $35,000. They further contended that their covenant not to compete with the buyer in the fuel oil business for seven years was simply an integral part of their gallonage guarantee; that it was not an independent arrangement with independent consideration being paid for it. The Tax Court found as to the $35,000, that 50% thereof was paid to petitioners for the good will of the partnership, Economy Oil and Supply Co., and 50% for the covenant not to compete entered into by them at the time of the sale. In accordance with that finding the court held, "The 50 percent attributed to the sale of goodwill will be treated as long-term capital gain and the 50 percent attributed to the covenant not to compete will be treated as ordinary income in a computation under Rule 50." Taxpayers seek review of this. They also urge a second point concerning the 1956 value of the purchase money mortgages which were part of the transaction.

In 1953, taxpayer Max Levine owned a chicken hatchery and poultry farm; taxpayer Jacob Dubrovsky was a feed salesman and had a small poultry farm. On April 2nd of that year, for the sum of $50,000, they purchased the Economy Oil & Supply Corp. which was engaged in selling gasoline, fuel oil, and kerosene, together with related products and services. The corporation had been in that business at the same location in Howell, New Jersey and under the same name since at least 1941. The sellers executed covenants barring them from competing in the fuel business for seven years within a radius of twenty-five miles of the property sold and providing that adjacent premises owned by "Economy Tire and Recapping Corp." would at no time "be used or occupied for the sale of fuel oil, kerosene, gasoline or motor oil except that which may be sold at retail in a service station located on said premises." We find no indication in the record that any separate consideration was stated or given for said covenants.

Levine and Dubrovsky formed a partnership under the trade name of "Economy Oil and Supply Co." Dubrovsky operated the business and was paid a salary. Levine continued with his poultry farm. He received no compensation from Economy.

In the latter part of the summer of 1956, taxpayers decided to sell the fuel oil branch of their enterprise, retaining the gasoline end of it. Samuel W. Katz became interested as a possible purchaser. At his first meeting with the owners in September 1956, Dubrovsky testified that he, for the partnership, gave Katz a price of $85,000—$50,000 for the real estate and personal property and $35,000 for the good will or gallonage. He and Levine did not have an accountant assisting them at the negotiations although Levine had a necessary consultation with one at a later stage in the proceedings, and, according to Dubrovsky their attorney was no tax expert. Dubrovsky said, "We were concerned with the total purchase price. We had no idea we would get so involved."

Levine testified that he and his partner indicated to Katz that they "wanted $35,000 for the 1,200,000 gallons". He did not recall whether he put the label of "good will" on the $35,000. He stated that Dubrovsky primarily conducted the negotiations for them; that "I was not actively conducting it."

That the gallonage was a most tangible asset appears clearly in the Tax Court's Findings of Fact. The fuel oil division of the partnership functioned to a large extent automatically, as is the nature of that type of business, with the owners thereof having "little direct contact with customers." The taxpayers had dropped 4 or 5% of the customers served by the old corporation chiefly because of poor credit performance "but in the main the list of customers was the same from year to year." In 1955 Economy had sold to customers " * * * approximately 1,200,000 gallons of fuel oil." The taxpayers applied what was testified to at the hearing as the accepted formula for valuing good will in the fuel oil industry during the year 1956 i: e. three cents

a gallon. In this instance it produced the amount of $36,000 which the taxpayers rounded off to $35,000.

Katz was a witness for the Commissioner. He testified regarding his first meeting with Dubrovsky and Levine:

"A. I asked them what they had to sell and how much they wanted. They told me what they had in gallonage; they told me what they had in tanks, buildings and land, equipment, trucks, and I asked them how much they wanted for their business and they told me they wanted $85,000 for the business.

"I asked them how they broke it down. They shrugged their shoulders and said there was no breakdown. All they wanted was $85,000 for the business."

He said Dubrovsky and Levine did not inform him that they were seeking to include "good will" in the $85,000 price. He claimed that because they did not break the total figure down that he, not his accountant, "had to break it down for them." The Tax Court did not go along with the last statement but found that at a later conference Katz's accountant suggested that the purchase price be broken down so that he could set up values on the books of the new corporation. The accountant proposed the values as follows:

"Land .................... $ 5,000.00
 Buildings .............. 8,500.00
 Tanks ................. 18,000.00
 Office Furniture ......... 2,000.00
 Trucks ................ 14,000.00
 Restrictive Covenants ..... 35,000.00
 Supplies ............... 2,500.00
 ———————
 $85,000.00"

Katz asserted on the witness stand that the $35,000 for the covenant was to protect the $50,000 he was putting into the business. The court found that "Katz made it plain, however, that he would not purchase at the price of $85,000 unless petitioners would agree to a covenant not

to compete in the fuel oil business for a period of 7 years; petitioners readily agreed that they would execute such a covenant." The meeting above referred to was adjourned to enable the taxpayers to consult their accountant. The latter advised them, " * * * that the breakdown made no difference to petitioners since the purchaser could treat the matter as he wished on his books without binding petitioners as to their treatment of the transaction." The Katz breakdown was thereafter inserted in the sale agreement preceded by the following language: "The parties hereto agree that in computing the purchase price, the following valuations have been fixed by the parties hereto." The court further found: "Katz's accountant was present at the negotiations between Katz and petitioners regarding the sale of Economy's fuel oil business and he was aware of the income tax consequences flowing from the allocation of a dollar amount to a covenant not to compete in connection with such a sale."

The agreement of sale, executed October 30, 1956, was drawn by the Katz attorney. It provided that petitioners would, inter alia, sell their fuel oil and kerosene business, including real estate, equipment, fixtures, motor vehicles, *good will,* and *trade name* to the new corporation for $85,000 and certain mutual covenants.

The new corporation formed by Katz, on its fiscal year income tax returns for 1957, '58 and '59, claimed deductions based on amortization of $35,000 which it alleged it had paid for "restrictive covenants". Those claims were disallowed by the Commissioner. The corporation paid the additional income taxes and has a suit pending for refund.

There is no real controversy concerning the applicable law. If the covenant before us is so closely related to the good will sold by petitioners to Katz " * * * that it fails to have any independent significance apart from merely assuring the effective transfer of that good will",[1]

1. Ullman v. Commissioner, 264 F.2d 305, 307–308 (2 Cir. 1959).

"* * * the covenant is regarded as nonseverable and as being in effect a contributing element to the assets transferred." [2]

Both the Commissioner and the Tax Court were confronted with a mean problem. Unquestionably the good will of petitioners' fuel oil corporation was a valuable asset. The Tax Court says regarding it: "Their [taxpayers] contention is based upon the fact that in the year prior to the year of sale the partnership sold 1,200,000 gallons of fuel oil and that the goodwill of the business was measured, according to custom, by 3 cents per gallon of fuel oil sold." Even Katz, unmistakably admitted the importance of the gallonage in order that "* * * you * * * can have a business." Again speaking of gallonage he said, "That's only a guide if you want to buy a business", which is just what Katz wanted to do and which he did.

Undeniably, the petitioners were solely interested in selling their fuel oil business for $85,000. They were entirely agreeable to a covenant barring them from engaging in the same activity for seven years. They had no intention of continuing in or later again conducting that kind of undertaking. And Katz does not contend that there was any bargaining about the over-all price. It is noteworthy that the Tax Court in assigning a portion of the $85,000 to good will did not disturb petitioners' estimate of their physical assets at $50,000 but allowed half of the remaining $35,000 to cover the good will sold. It should also be emphasized that Katz, while vehemently asserting that the physical assets were worthless without the gallonage, gave no value whatsoever to the latter in his breakdown, did not mention good will either, and actually testified that "* * * good will is profit that you make and not on gallonage." Actually, the record leaves no doubt but that the income and profit from the petitioners' fuel oil venture was fundamentally derived from gallon sales. But this itself points up the difficulty with petitioners' ably argued cause.

The Tax Court for substantial reasons accepted Katz's evidence that he would not have agreed to buy the business unless the owners agreed to give him very definite restrictive covenants which would completely bar them from competing with him for seven years within a forty mile zone. From the facts, Katz needed that protection. He was from Brooklyn and Queens in the Greater New York area, a stranger to the rural New Jersey territory of the business he was taking over. The taxpayers belonged there and had been engaged in their fuel oil operation for the then last three and one half years. They intended to continue to sell gasoline from practically the same premises as those where Katz would be dispensing his fuel oil. Under the agreement, they were entitled for the period of a year to retain the position of their gas pumps and to use the office, parking and storage space and storage tanks. Given the solid background of the taxpayers familiarity with the fuel oil trade of the business involved, their continued presence on the scene, without their explicit written commitment not to deal in fuel oil, was a viable threat to the new owner. In that situation the court, aside from the undoubted tax motivation of Katz, from all the facts considered that the covenant was of major consequence to him. It stressed that while he was willing to pay the sum asked, "Katz made it plain, however, that he would not purchase at the price of $85,000 unless petitioners would agree to a covenant not to compete in the fuel oil business for a period of 7 years; * * *." The court concluded that the purchaser had paid one half of the $35,000 (which was over and above the $50,000 given for the land and physical assets) to obtain the covenant. The court decided that the remaining half of the $35,000 was in payment for the good will.

As we see it, the Tax Court's primary factual finding, in effect that the parties

---

2. Aaron Michaels, 12 T.C. 17, 19 (1949).

intended to and did allocate consideration to the covenant here, is founded on substantial evidence. The court did conclude that the total amount assigned for the covenant, as insisted upon by Katz, was too high but rightly attributes signficance to its being given a value. Strong proof must be adduced to overcome that fact. Ullman v. Commissioner, 264 F.2d 305 (2 Cir. 1959). The court on this record was justified in deciding that such proof had not been produced. The court also had before it uncontradicted proof that the buyer's refusal to consummate the transaction unless he was protected by a noncompetitive covenant had an " * * * arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." Schulz v. Commissioner, 294 F.2d 52, 55 (9 Cir. 1961). And see Annabelle Candy Co. v. Commissioner, 314 F.2d 1 (9 Cir. 1963).

Likewise, the Tax Court decision that the good will was of considerable worth is amply supported by the record. The business was a going concern with retail sales of fuel oil the previous year amounting to 1,200,000 gallons. There was a reasonable expectancy of that volume continuing under the new management and it is clear from the testimony that this gallonage good will was specifically meant to be transferred to the purchaser. Cf. Grace Bros. v. Commissioner, 173 F.2d 170, 176 (9 Cir. 1949).

Finally we come to the allocation of the $35,000 by the Tax Court, half to the covenant and half to good will. The evidence fully justifies the decision that the listing of the entire $35,000 for the covenant was never the true understanding of the parties. The agreement stated both good will and the corporate name among the assets being sold. The taxpayers estimated the good will alone as worth $35,000. Katz, who later asserted in his tax return that the $35,000 was all paid for the covenant and who is now on that theory claiming a refund of taxes paid, refused to concede any part of the $35,000 as having been in consideration of the good will. The Tax Court, confronted with the disparate views of the parties, did the best that could be done under all the facts and allowed half of the $35,000 to the covenant and half to good will.

In so doing the court, under the evidence, was dealing with the realities of the problem before it. It was convinced that both the sellers' figure for their good will and the buyer's statement of how much he paid for the covenant were too high. Due perhaps to the nature of the problems or the methods of presentation there was no material in the record from which the exact amounts deemed properly allowable by the court could be ascertained. But there was enough evidence in the whole case from which the court could and did arrive at a rational fair approximation of the worth of the good will and the covenant. As we said in McKelvey v. Commissioner, 246 F.2d 609, 612 (3 Cir. 1957), "In the exercise of our reviewing function of determining whether the findings of fact of the Tax Court have a substantial basis in the record, we must look primarily to the evidence supporting the inferences made by the Tax Court, and not scan the record in an attempt to sustain a contrary inference suggested by a litigant." In the face of this record we cannot accept the propositions that the amounts fixed by the court have no evidential warrant and are no more than speculation. The Tax Court in its judgment did not accept in full the total presented either by the sellers or buyer for the good will and covenant respectively. It did agree that both items were valuable. In those circumstances to allow nothing for the good will or for the covenant or for both would have been at the least inconsistent. At the same time one hundred per cent accuracy in fixing the respective amounts was impossible. So the court made the closest approximation it could. See Cohan v. Commissioner, 39 F.2d 540, 543–544 (2 Cir. 1930). Because there is sufficient evidence to substantiate the amounts allowed for good will and the covenant there is no need or use to re-

mand the matter for further testimony in that connection.

■ The second point submitted by the taxpayers concerns their contention that the purchase money mortgages which they accepted as part of the purchase price had no market value when they were received in 1956. Taxpayers therefore say that they erred in listing $35,000 as the amount of the mortgages in their partnership income in 1956; that the mortgages had no value to them during 1956.

We think that this question was before the Tax Court and passed upon by the latter in its denial of petitioners' motion to withdraw and reconsider Findings of Fact and Opinion. All of the circumstances in connection with the mortgages are before us. The issue regarding them has been competently argued by both sides. There is no necessity of remanding this phase of the review. We agree with the Tax Court that petitioners did not sustain their burden of establishing that the mortgages were valueless.

Petitioners rely on the restrictions on assignments contained in the mortgages. The restrictions of themselves did not render the mortgages valueless in the year received. We so held explicitly in Heiner v. Gwinner, 114 F.2d 723, 725 (3 Cir. 1940), cert. den. 311 U.S. 714, 61 S.Ct. 396, 85 L.Ed. 465 (1940). Admittedly the petitioners had accepted them as $35,000 of the purchase price and listed them at that figure in their income tax returns as part of the sale price received from Katz. The governing regulation of the 1954 Code, Section 1.1001-1(a) reads: "The fair market value of property is a question of fact, but only in rare and extraordinary cases will property be considered to have no market value."

The maximum period of the restriction was one year. Release of the restrictions and freedom to unconditionally assign the mortgages depended upon the check out of the owners' representation of the amount of the previous year's sales. That entailed merely an examination of the books and records. We find nothing in evidence to indicate this would have taken any appreciable length of time. The other condition was that the new owner would sell a minimum of 1,100,000 gallons of fuel oil its first year. As the respondent suggests that could have been waived and there was no assertion that an estoppel certificate nullifying the restriction was refused when requested. And there is no evidence that the mortgages were indisposable because of possible deferred delivery.

The decision of the Tax Court will be affirmed.