MADISON FUND, INC. (FORMERLY THE PENNROAD CORPORATION), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 93718, 4194–62.    Filed November 23, 1964.

*William R. Spofford, Charles S. Jacobs,* and *Robert E. McQuiston,* for the petitioner.

*Albert J. O'Connor,* for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax as follows:

| Docket No. | Taxable year | Amount of deficiency |
|---|---|---|
| 93718 | 1956 | $2,779,950.93 |
| 4194-62 | 1958 | 337,805.48 |
| | 1959 | 76,040.55 |
| | 1960 | 1,559,545.41 |

As the result of certain agreements and concessions of the parties, the only issue remaining for decision is whether in computing the gain or loss upon the sale by the petitioner of certain securities in the years 1952, 1953, 1954, 1955, 1958, and 1960 the basis of such securities should be reduced on account of the receipt by petitioner in 1947 from the Pennsylvania Railroad Co. of a net amount in settlement of certain stockholders' derivative suits, and, if so, the portion of such net amount which is properly allocable in reduction of the basis of each security. Losses upon the sales in 1952 through 1955 are in issue because of a claimed capital loss carryover to the taxable year 1956.

All the facts upon this issue have been stipulated and the stipulations are incorporated herein by this reference.

### FINDINGS OF FACT

The petitioner is a corporation organized under the laws of the State of Delaware, with its principal office at Wilmington. Its name was changed in 1956 from the Pennroad Corp. to Madison Fund, Inc. At all material times it kept its books and accounts and filed its Federal income tax returns on an accrual method of accounting and on a calendar year basis. For each of the years 1947 to 1955, inclusive, it, as the common parent corporation of an affiliated group of corporations, filed consolidated income tax returns for itself and its affiliated corporations. In 1956 petitioner elected to be taxed as a regulated investment company under subchapter M, chapter 1, of the Internal Revenue Code of 1954, and thereafter ceased to file consolidated returns. For each of the taxable years in question it filed its Federal income tax return with the district director of internal revenue at Wilmington, Del.

For some time prior to 1929, the officers and directors of the Pennsylvania Railroad Co. (hereinafter referred to as Pennsylvania) believed that in order to extend their railroad's empire it was necessary to be prepared financially and otherwise to find a means of controlling other

railroads, and that it was necessary to start acquiring stock in the railroads which Pennsylvania desired to have in its system. Investigations and negotiations had begun looking to the acquisition of an interest in certain railroads whose routes had been allocated to other carriers in a tentative plan of railroad consolidation promulgated by the Interstate Commerce Commission in 1921 pursuant to the requirements of the Transportation Act. Pennsylvania wished to secure control of these railroads in order to preclude the possibility of their allocation to other systems. Because of Interstate Commerce Commission regulations and the Transportation Act, it was not legally possible for Pennsylvania to acquire such stock without reporting the same to and securing the approval of the Interstate Commerce Commission, and it was believed that such approval could not be obtained. The same obstacles would have been presented if Pennsylvania had acquired such stockholdings through a subsidiary. The officials of Pennsylvania were also aware that the Clayton Antitrust Act made it hazardous for Pennsylvania or a subsidiary to acquire control of other railroads where the effect might be to lessen competition.

The conclusion was reached that the only satisfactory way to accomplish this purpose was through the incorporation of a separate investment company to be controlled by Pennsylvania and owned by Pennsylvania's stockholders. It was then decided to form petitioner and to extend to the stockholders of Pennsylvania the right to subscribe the capital necessary to accomplish its purpose. The plan devised by the Pennsylvania officials contemplated that Pennsylvania's management should have and retain practical control of petitioner and its operations (although petitioner would have the appearance of an independent entity), and the power to bring other railroad properties within the sphere of the Pennsylvania system without the necessity of reporting or obtaining approval of such acquisitions.

On April 24, 1929, Pennsylvania caused petitioner to be formed as an investment company having an authorized capital of 10 million shares of no-par value stock. Petitioner's first directors were also directors of Pennsylvania and constituted almost the full membership of the finance committee of the latter company. Petitioner's board of directors elected as its first officers persons who had theretofore been employed by Pennsylvania. At its first meeting, petitioner's board of directors authorized the issuance of 5.8 million shares of stock to be placed under a 10-year voting trust with three directors of Pennsylvania as voting trustees. The stockholders of Pennsylvania were simultaneously invited to subscribe to the voting trust certificates, which were also offered to the public through underwriters. The voting trust certificates were subsequently issued for an aggregate consideration of $91,125,000. Later in 1929, in con-

nection with the purchase of stock of Pittsburgh & West Virginia Railway Co., petitioner issued additional voting trust certificates, paying underwriting fees of $5,251,586 and receiving a net amount of $44,660,914.

By reason of the voting trust arrangement, the interlocking directorate, the designation of official and subordinate personnel with a long history of loyalty to Pennsylvania service, and the purpose out of which the plan evolved, Pennsylvania obtained full and complete power over the policies, investments, and other acts of petitioner.

At various times prior to the commencement of the litigation referred to hereinafter, petitioner purchased stock and securities of the following corporations:

> Detroit, Toledo & Ironton Railroad Co.
> Pittsburgh & West Virginia Railway Co.
> Canton Co. of Baltimore (which owned all of the stock of Canton Railroad Co.).
> Seaboard Air Line Railway Co.
> New York, New Haven & Hartford Railroad Co.
> Boston & Maine Railroad
> Lehigh Valley Railroad Co.
> Raritan River Railroad Co.

All of the investments were made at the instance of Pennsylvania acting through its officials who were also connected with and charged with the affairs of petitioner and who recognized that petitioner had been formed to accomplish what Pennsylvania could not do in its own right and in its own name, and to make investments to the benefit and advantage of Pennsylvania.

In the spring of 1929, Pennsylvania's management was aware that a crucial condition then existed with respect to Pennsylvania's less-than-carload freight business. It was believed indispensable to own or control a freight-forwarding company which would operate in Pennsylvania's territory in order to offset the competition of New York Central Railroad Co. operating through Universal Freight Co. and to forestall the prospective competition of other forwarding companies operating with other railroad lines. A plan for the formation of such a company was formulated, and since both Pennsylvania and its subsidiary, Pennsylvania Co., were legally disqualified to act, it was decided to put the plan into operation through the instrumentality of petitioner. Accordingly, in August 1929, Pennsylvania caused petitioner to form National Freight Co. and to advance funds to the latter. Throughout its operations, National Freight Co. suffered increasing deficits. It ceased operations in November 1931, at which time it sold all of its assets and goodwill to National Carloading Co. for stock in the latter. In 1933 National Freight Co. sold all of its stockholdings and other interest in National Carloading

Co. The freight-forwarding business conducted through National Freight Co. consisted of soliciting less-than-carload freight shipments, combining them into carload lots and shipping them at carload rates. It was thus dependent for its profit upon the difference between the railroad's lower rates charged for carload shipments and the higher less-than-carload rates which it charged. In fact, the business produced losses rather than profits. Pennsylvania, however, profited substantially from the freight-forwarding venture through the added freight revenue received by it for hauling National Freight Co. traffic, the rental of certain of its facilities to National Freight Co., and the promotion of its competitive position as long as National Freight Co. operated.

On October 18, 1932, Joseph W. Perrine and Julia A. Perrine, on behalf of themselves and all other stockholders and voting trust certificate holders of petitioner, commenced suit in the Delaware Court of Chancery, joining as defendants therein petitioner, Pennsylvania, certain directors and officers of both companies, and the trustees of the voting trust holding petitioner's capital stock. The bill of complaint in the Perrine suit alleged, *inter alia*, the formation of the petitioner as a mere sham or device to enable Pennsylvania to advance its own interests, and charged further that Pennsylvania and the individual defendants had caused petitioner to make investments in various corporations in the interest of Pennsylvania rather than Pennroad. The investments listed in the Perrine complaint were as follows:[1]

| Name | Number of shares | Class of stock |
|---|---|---|
| Detroit, Toledo & Ironton R.R. Co. | 245,326 | ———— |
| Pittsburgh & West Virginia Ry. Co. | 222,330 | Common. |
| Seaboard Air Line Ry. Co. | 402,119 | ———— |
| New York, New Haven & Hartford R.R. Co. | 148,800 | Common. |
| Do. | 1,200 | Preferred. |
| Boston & Maine R.R. | 173,822 | Preferred (various classes). |
| Do. | 27,565 | Common. |
| Lehigh Valley R.R. Co. | 10,000 | Do. |
| Raritan River R.R. Co. | 4,485 | Do. |

It was alleged in that action that petitioner in making investments from 1929 through 1932 in the above securities and other securities expended in excess of $115 million, and incurred indebtedness in excess of $37.5 million, that the investments were at exorbitantly high prices which bore no true relation to real or investment value; that the investments were worth but a small fraction of their cost to petitioner; and that consequently petitioner had suffered and would continue to suffer enormous losses resulting from the deliberate attempt on the part of the defendants to benefit Pennsylvania at the expense

---

[1] No reference was made in the Perrine complaint to petitioner's investments in Canton Co. of Baltimore and National Freight Co.

of the petitioner. Among the forms of relief asked were an accounting to determine the full amount of such losses and a decree requiring the defendants to pay such amount to petitioner.

On March 30, 1939, Ione M. Overfield commenced a similar proceeding in the District Court of the United States for the Eastern District of Pennsylvania (hereinafter referred to as the District Court), joining as defendants petitioner, Pennsylvania, and certain directors of both companies and executors of deceased directors. The complaint, as subsequently amended by leave of court, alleged, *inter alia*, that the defendants, pursuant to a premeditated and preconcerted scheme to use the funds and corporate powers of petitioner for the benefit and advantage of Pennsylvania, had caused petitioner to make investments in various corporations.[2] It was further alleged that petitioner had lost most of its capital investment in the National Freight Co. venture whereas Pennsylvania had profited therefrom through the receipt of freight revenues and rentals, and that petitioner had suffered large losses by reason of the purchase and ownership of the various other securities, whereas Pennsylvania had realized large profits and enjoyed many benefits resulting therefrom. The complaint prayed for an adjudication that the defendants be required to render an account for all such losses and that they be adjudged liable to petitioner for such losses and be required to pay over to petitioner all profits realized by Pennsylvania by reason of the various investments, including the freight-forwarding business.

On June 7, 1940, Grace Stein Weigle commenced a proceeding in the same District Court substantially identical to the Overfield suit. On February 10, 1941, the District Court ordered the Overfield and Weigle suits consolidated for purpose of trial.

On December 20, 1941, following approximately 90 days of trial, the District Court rendered an opinion in the Overfield-Weigle suit, reported at 42 F. Supp. 586. The District Court held, among other things, that the defendants, in forming and operating petitioner pri-

---

[2] No reference was made to petitioner's investment in Raritan River RR. Co., which had been sold by petitioner in 1931 at a profit, nor to the underwriting fees. Reference was made to the following investments made principally in 1929, but some of which were made in 1930 and 1931: Detroit, Toledo & Ironton RR. Co., 245,326 shares of stock for $36 million; Canton Co. of Baltimore, 21,975 shares of common stock for $13,432,817.50; Pittsburgh & West Virginia Ry. Co., 220,000 shares of common stock for $37,400,000; Seaboard Air Line Ry. Co., 402,119 shares for $4,523,838.75; Lehigh Valley RR. Co., 10,000 shares (cost not shown); New York, New Haven & Hartford RR. Co., 148,800 shares of common stock for $17,301,851.25 and 1,200 shares of preferred stock for $149,300; Boston & Maine RR. Co., 27,565 shares of common stock and 173,822 shares of various preference stocks at a total cost of $23,637,708.38; National Freight Co. (contribution to capital, approximately $2.3 million). It was alleged that all the purchases of securities were at exorbitant prices. In some instances the excess of purchase price over value was stated, while in others it was not. With respect to the investment in National Freight Co., it was alleged that the petitioner suffered a loss in excess of $4 million, while Pennsylvania received freight revenues therefrom in excess of $5 million, of which a large part represented net profit.

marily for the benefit of Pennsylvania and its stockholders and employing the capital investments of petitioner's certificate stockholders for that purpose, had assumed a fiduciary relationship and obligation toward petitioner and its investors, which obligation it had breached; that the suit as against the individual defendants was barred by the statute of limitations of the State of Pennsylvania; that Pennsylvania was obligated to reimburse petitioner for the net amount of petitioner's capital loss in the National Freight Co. venture and to account for and pay to petitioner all net profits received by it arising out of the charges paid by National Freight Co. for hauling of freight by Pennsylvania or for the rental of facilities from that company.

The District Court on January 19, 1943, issued a supplemental opinion, reported at 48 F. Supp. 1008, in which it held Pennsylvania liable to the petitioner on account of some of the investments and for profits resulting from the freight-forwarding business.[3]

All parties appealed from the judgment of the District Court to the U.S. Court of Appeals for the Third Circuit. The majority and dissenting opinions of the Court of Appeals were filed on December 28, 1944, and are reported at 146 F. 2d 889. The majority opinion affirmed the judgment of the District Court in dismissing the complaint as to the individual defendants, but reversed the judgment entered against Pennsylvania, holding the suit barred by the statute of limitations of the State of Pennsylvania, and expressly avoided consideration of the merits of the complaint. The dissenting opinion took the view that the statute of limitations was not applicable to any of the defendants and that the liability of such defendants extended to the full limits of the investments made and the losses sustained by petitioner regardless of cause. The petitioner and the complaining

---

[3] The District Court determined the following liability of Pennsylvania to the petitioner:

| | |
|---|---:|
| Reimbursement for damages arising out of purchase of shares of stock of Pittsburgh & West Virginia Ry. Co. | $9,140,130.00 |
| Reimbursement for damages arising out of purchase of shares of stock of Seaboard Air Line Ry. Co. | 4,450,152.04 |
| Reimbursement for damages arising out of purchase of shares of stock of Boston & Maine RR. | 1,271,983.88 |
| Reimbursement for damages arising out of investment in National Freight Co. and National Carloading Corp. | 3,852,000.00 |
| Profits resulting to the Pennsylvania RR. Co. from transactions of National Freight Co. and National Carloading Corp. with the Pennsylvania RR. Co. | 3,390,250.00 |
| Total | 22,104,515.92 |

The amount awarded by the court on account of the investments in Pittsburgh & West Virginia Ry. Co., Seaboard Air Line Ry. Co., and Boston & Maine RR. was found by the court to be the excess of the price paid for the securities over their fair value at the time of purchase, as nearly as such figures could be approximated. The award for damages arising out of the investment in National Freight Co. represented the entire net investment in that company. As to the other investments complained of in the suit, the court found that losses were attributable to causes other than purchase at excessive prices and made no awards on account thereof.

stockholders were, from time to time, granted extensions of time until May 31, 1946, within which to file petitions for rehearing.

After prolonged negotiations, petitioner and Pennsylvania on March 2, 1945, executed a settlement agreement providing for the payment of $15 million by Pennsylvania to petitioner in settlement of all the matters complained of in the Overfield-Weigle and Perrine suits. The agreement provided that the settlement was subject to approval of the Chancery Court of Delaware and conditioned upon final termination of both suits.

On March 16, 1945, petitioner filed in the Perrine suit in the Chancery Court of Delaware a petition for approval of such agreement. Such court approved the agreement on August 9, 1945, *Perrine* v. *Pennroad Corporation*, 28 Del. Ch. 405, 43 A. 2d 721. An appeal was taken and on May 10, 1946, the Supreme Court of Delaware affirmed the opinion of the Chancery Court, *Perrine* v. *Pennroad Corporation*, 29 Del. Ch. 531, 47 A. 2d 479, certiorari denied 329 U.S. 808 (1947).

On February 19, 1947, after all conditions of the settlement agreement had been fulfilled, Pennsylvania paid to the petitioner the sum of $15 million, as provided in the settlement agreement.

Judge Welsh, who had heard the Overfield-Weigle case in the District Court, agreed to act as arbitrator of the claims of those entitled to compensation for services and expenses in connection with the suits against Pennsylvania. On May 5, 1947, he awarded a total of $2,495,794.18 for fees and expenses. Thereafter petitioner paid in satisfaction of this award and an award made by the Delaware Court of Chancery, the amount of $2,797,195.69. The remaining $12,202,804.31 was credited by the petitioner on its books of account to capital surplus and no part was treated by petitioner as income. Thereafter, in 1947 other fees and expenses were paid, reducing the net recovery to $12,060,809.73. In 1948 the petitioner paid additional fees and expenses of $51,222.75, reducing the net recovery to $12,009,586.98.

For the petitioner's taxable year 1947 the respondent determined that as a result of the receipt of a net recovery of $12,060,809.73 the petitioner was in receipt of taxable income in the amount of $2,876,782.49. He arrived at this result by allocating such net recovery among the investments with respect to which the District Court had made awards, and in the same proportion as the amount of such awards made by the District Court. He determined that the amount allocable to Seaboard Air Line Railway Co. securities exceeded the basis by $457,679.25 and that the amount allocated to the investment in National Freight Co. exceeded the basis by $569,292.99, and held that these excesses constituted taxable income in 1947. In addition, he determined that $1,849,810.25 of the recovery represented profits from the freight-forwarding business. Later he abandoned the contention

that the petitioner had derived income with respect to the Seaboard Air Line Railway Co. investment. The petitioner filed a petition for a redetermination by this Court, docket No. 33309, alleging, *inter alia*, that no portion of the recovery from Pennsylvania was taxable to petitioner as income. In *Pennroad Corporation*, 21 T.C. 1087, this Court held that no portion of the recovery was includable in the petitioner's income for 1947. The decision of this Court was affirmed by the U.S. Court of Appeals for the Third Circuit, *Commissioner* v. *Pennroad Corporation*, 228 F. 2d 329.

With respect to the matters complained of in the Overfield-Weigle and Perrine suits, petitioner had made expenditures and realized losses as of February 19, 1947, as follows:[4]

(1) Underwriting fees were expended by petitioner in 1929 in connection with the issuance of additional Pennroad voting trust certificates, the proceeds of which were used to purchase Pittsburgh & West Virginia Railway Co. stock. This was complained of in the Perrine suit (but not in the Overfield-Weigle suit) and amounted to $5,251,586. This amount was never deducted by petitioner on any of its Federal income tax returns or allowed as a deduction by respondent.

(2) During 1934 and 1936, petitioner's $3,852,000 investment in National Freight Co. was charged off as a loss. Petitioner did not claim a deduction on its Federal income tax returns.

(3) During 1937, 1942, and 1943 petitioner disposed of its entire investment of $650,000 in Lehigh Valley Railroad Co., at a net loss of $449,317.60. Of this sum, $340,599.43 resulted from the sale of a portion of the stock in 1937, $12,489.01 resulted from the portion sold in 1942, and $96,229.16 resulted from the portion sold in 1943. These losses were reported on petitioner's returns for those years.

(4) A lot of 402,119 shares of Seaboard Air Line Railway Co. stock was purchased in 1930 by petitioner at a cost of $4,531,881.13. In 1939, 50,000 shares of such lot were sold at a net loss to petitioner of $544,123.52, which was reported in petitioner's return for that year. The remaining 352,119 shares were sold by petitioner in 1940 at a net loss of $3,885,922.57, which was reported in petitioner's return for that year.

(5) One hundred fifty thousand shares of common and preferred stock of New York, New Haven & Hartford Railroad Co. were purchased by petitioner between July 1929 and June 1930. Of these, 68,500 shares purchased at an original cost of $7,974,666.77 were sold in 1941, 1945, and 1946 at net losses of $2,947,981.08, $2,854,477.24, and $2,112,143.78, respectively, resulting in an aggregate net loss of

---

[4] The amounts shown as "cost," "basis," "gain," and "loss" have been computed without any reduction in basis as a result of the $12,009,586.98 net recovery from Pennsylvania.

$7,914,602.10. These losses were reported in the petitioner's returns for those years.

(6) During June 1929 petitioner purchased stock and bonds of Detroit, Toledo & Ironton Railroad Co. for an aggregate consideration of $35,499,312.42. Of this amount, $3,975,487.57 represented bond interest accrued but unpaid at the date of purchase. This interest was received by petitioner during the years 1929 and 1930, and by a journal entry dated December 31, 1938, the book cost of petitioner's investment in such company was reduced by the amount of such interest. Prior to February 19, 1947, petitioner disposed of a portion of its Detroit, Toledo & Ironton Railroad Co. investment having an original cost of $11,582,094.68, plus subsequent purchases totaling $61,887.50, at a profit of $1,261,660.10.

(7) During the years 1943, 1944, and 1945 a small portion of petitioner's shares of capital stock of Canton Co. of Baltimore, having an original cost of $1,222,554.53, was redeemed from petitioner by Canton Co. of Baltimore at a net loss of $460,054.53. However, the loss was not recognized for tax purposes because Canton Co. of Baltimore was included in consolidated returns filed by petitioner for each of those 3 years.

(8) During 1931 petitioner sold its $682,250 investment in Raritan River Railroad Co. at a net profit of $90,322.80.

With respect to the matters complained of in the Overfield-Weigle and Perrine suits, petitioner still owned, as of February 19, 1947, the following:

| | Original cost | As of Feb. 19, 1947 | |
| --- | --- | --- | --- |
| | | Adjusted basis [1] | Value [2] |
| New York, New Haven & Hartford | $9,476,484.48 | $9,476,484.48 | $112,062.50 |
| Pittsburgh & West Virginia | 37,898,100.00 | 37,898,100.00 | 3,594,746.25 |
| Boston & Maine | 23,637,708.38 | 23,637,708.38 | 2,746,771.63 |
| Detroit, Toledo & Ironton | 23,917,217.74 | 19,941,730.17 | 19,941,730.17 |
| Canton Co. of Baltimore | 12,210,263.37 | 12,210,263.37 | 6,948,249.66 |
| Total | 107,139,773.97 | 103,164,286.40 | 33,343,560.21 |

[1] Fn. 4, *supra*, is here applicable.

[2] The figures shown as "value," in the case of Boston & Maine R.R. Co., the Pittsburgh & West Virginia Ry. Co., and the New York, New Haven & Hartford R.R. Co. represent values at market quotations of the stock on Feb. 19, 1947, if available; otherwise at the latest date between Dec. 31, 1946, and Feb. 19, 1947. There were no market quotations with respect to the stock of the Detroit, Toledo & Ironton R.R. Co. and the Canton Co. of Baltimore; the value stated for those stocks represents book value as shown on petitioner's books as of Dec. 31, 1946.

With respect to the investments referred to above, the following gains and losses were realized subsequent to the date of settlement, February 19, 1947: [5]

---

[5] Fns. 4 (text) and 2 (table above) are here applicable.

*During 1947.*—Subsequent to the settlement, petitioner sold 31,500 shares of common stock in New York, New Haven & Hartford Railroad Co., with an original cost and tax basis of $3,662,690.22. In addition, petitioner charged off as worthless the remaining 50,000 shares of common stock with an original cost and tax basis of $5,813,794.26 on September 18, 1947, the effective date of the reorganization of the railroad. Petitioner sustained in 1947 an aggregate loss of $9,452,061.98 from this investment. Such loss was reported in petitioner's return for 1947. Such 81,500 shares had a value and a tax basis on the date of settlement of $112,062.50 and $9,476,484.48, respectively.

*During 1948.*—Twenty-seven thousand five hundred sixty-five shares of common stock in Boston & Maine Railroad Co. with an original cost and tax basis of $3,204,265.15 were sold by petitioner at a loss of $3,085,147.84. These shares had a value and a tax basis of $141,270.63 and $3,204,265.15, respectively, on the date of settlement.

*During 1949.*—Petitioner sold 13,804 shares of Boston & Maine Railroad Co. first preferred C stock, 14,668 shares of first preferred D, and 14,968 shares of preferred, having a total original cost and tax basis of $6,027,806.21. Petitioner sustained a total loss of $5,943,566.21 from the disposition of these investments. These shares had a total value and a tax basis on the date of settlement of $329,715 and $6,027,806.21, respectively.

*During 1950.*—From petitioner's Boston & Maine Railroad Co. investment, petitioner sold 42,000 shares of first preferred A having an original cost and tax basis of $3,785,155.46, sustaining a loss of $3,619,255.46. At the date of settlement such shares had a value and a tax basis of $336,000 and $3,785,155.46, respectively.

Petitioner sold 600 shares of common stock in Pittsburgh & West Virginia Railway Co., acquired at an original cost of $102,000 and having a tax basis of $102,091.87, sustaining a loss of $84,594.75. Such shares had a value and a tax basis of $9,675 and $102,000, respectively, as of the date of settlement.

*During 1951.*—The remaining investment of petitioner in Detroit, Toledo & Ironton Railroad Co. consisting of 245,329 shares of common stock with an original cost of $23,917,217.74 and a tax basis of $20,096,598.18 was sold by petitioner, resulting in a gain of $5,770,891.58. In 1952, petitioner received a tax refund of $5,878.28 (originally paid under agreement of sale) which was treated as a reduction of basis in the loss carryover for 1952. The resulting basis is $20,090,719.90. At settlement these shares had a value and an adjusted tax basis of $19,941,730.17.

Petitioner sold 21,800 shares of common stock in Pittsburgh & West Virginia Railway Co. with an original cost of $3,706,000 and a tax basis of $3,709,337.80, sustaining a loss of $3,227,122.11. The value and tax basis on the date of settlement of such shares were $351,525 and $3,706,000, respectively.

*During 1952.*—Four hundred shares of prior preference Boston & Maine Railroad Co. stock and 17,000 shares of Boston & Maine Railroad Co. first preferred B stock were sold by petitioner. Such shares had a combined original cost and tax basis of $2,560,472.55, resulting in an aggregate loss of $2,418,624.45 to petitioner in 1952. This aggregate loss was reported on petitioner's return for that year. At the time of settlement such shares had a value of $167,200 and a tax basis of $2,560,472.55.

Petitioner sold 25,000 shares of common stock in Pittsburgh & West Virginia Railway Co. with an original cost of $4,250,000 and a tax basis of $4,253,827.76, sustaining a loss in the amount of $3,749,077.76. This loss was reported by petitioner on its income tax return for that year. At the date of settlement such shares had a value of $403,125 and a tax basis of $4,250,000.

*During 1953.*—Petitioner sold 14,900 shares of Boston & Maine Railroad Co. prior preference stock, 6,900.8 shares of 5-percent preferred stock, and 49,674.17 shares of common stock. The total original cost and tax basis of such shares was $5,940,631.66 and the total loss sustained by petitioner was $4,154,215.44. This loss was reported by petitioner on its income tax return for that year. At the time of settlement such shares had a total value of $1,104,354.59 and a total tax basis of $5,940,631.66.

*During 1954.*—Petitioner sold the remainder of its investment in Boston & Maine Railroad Co. consisting of 27,904 shares of 5-percent preferred with an original cost and tax basis of $2,119,377.35, sustaining a loss of $1,414,268.04. This loss was reported by petitioner on its income tax return for that year. Such shares, at the time of settlement, had a value of $668,231.41 and a tax basis of $2,119,377.35.

Petitioner sold 54,000 shares of Pittsburgh & West Virginia Railway Co. with a tax basis of $9,188,267.96 and an original cost of $9,180,000, sustaining a loss of $8,127,132.96. This loss was reported by petitioner on its income tax return for that year. At the time of settlement, such shares had a value of $870,750 and a tax basis of $9,180,000.

*During 1955.*—The remainder of petitioner's investment in Pittsburgh & West Virginia Railway Co., 121,530 shares of common stock, having an original cost of $20,660,100 and a tax basis of $20,678,707.49, was sold at a loss of $17,503,475.37. This loss was reported by petitioner on its income tax return for that year. Such shares, at the time

of settlement, had a value of $1,959,671.25 and a tax basis of $20,660,100.

*During 1958.*—Fifty-seven thousand shares of Canton Co. of Baltimore common stock, having an original cost of $1,742,140.19 and a tax basis of $991,364.78 were sold, resulting in a gain of $437,179.67. The gain on this sale was reported by petitioner on its income tax return for that year. Such shares had a value of $991,364.78 and a tax basis of $1,742,140.19 at the time of settlement.

*During 1960.*—The remainder of petitioner's investment in Canton Co. of Baltimore, 342,500 shares of common stock with an original cost of $10,468,123.18 and a tax basis of $5,939,504.33, was sold, resulting in a gain to petitioner of $2,480,042.45. This gain was reported by petitioner on its income tax return for that year. At the time of settlement such shares had a value of $5,956,884.88 and a tax basis of $10,468,123.18.

In a revision of ledger values as of December 31, 1938, based primarily upon market quotations, the petitioner reduced the ledger values of the then remaining securities complained of in the stockholders' derivative suits, and the reductions were charged on petitioner's books to capital surplus. The following tabulation shows the reductions made and the remaining ledger values as of December 31, 1938:

| | Cost | Reduction in ledger value | Ledger value Dec. 31, 1938 |
|---|---|---|---|
| Pittsburgh & W. Va. Ry. Co. | $37,910,145.00 | $34,422,176.25 | $3,487,968.75 |
| Boston & Maine RR. | 23,637,708.38 | 23,057,782.25 | 579,926.13 |
| Seaboard Air Line Ry. Co. | 4,523,838.75 | 4,272,514.37 | 251,324.38 |
| Detroit, Toledo & Ironton RR. Co. | 36,656,006.80 | [1] 3,975,487.57 | 32,680,519.23 |
| Canton Co. of Baltimore | 13,432,817.90 | 5,514,008.66 | 7,918,809.24 |
| New York, New Haven & Hartford RR. Co. | 17,451,151.25 | 17,297,551.25 | 153,600.00 |
| Lehigh Valley RR. Co. | 117,000.00 | 107,550.00 | 9,450.00 |

[1] In the case of Detroit, Toledo & Ironton RR. Co. the reduction at Dec. 31, 1938, in the ledger value by the amount of $3,975,487.57 was for interest received on Detroit, Toledo & Ironton RR. Co. adjustment mortgage 5% bonds accrued and unpaid at date of purchase, theretofore carried in capital surplus.

All of the investments involved in the Perrine and Overfield-Weigle litigation had been sold or charged off before the end of the taxable year 1960.

In its returns for the years 1952 to 1960 the petitioner reported gain or loss on the sales of the portions of the securities sold in those years. In each instance the losses on such sales were used to offset gains on sales of securities or were used to compute capital loss carryovers to offset capital gains in succeeding years. In computing the gain or loss on sales or exchanges of the investments involved in the Perrine or Overfield-Weigle litigation, whenever such sales occurred, petitioner did not adjust the basis of such securities by any portion of the 1947 settlement proceeds.

In its return for 1956 the petitioner claimed a capital loss carryover as follows:

From—
| | |
|---|---|
| 1951 | None |
| 1952 | $3,087,343.25 |
| 1953 | 2,388,918.35 |
| 1954 | 3,530,274.26 |
| 1955 | 5,586,881.64 |
| Total | 14,593,417.50 |

This had the effect of offsetting to that extent capital gains realized in 1956 in the amount of $16,983,361.98.

In the notice of deficiency for 1956 the respondent applied the net recovery, $12,009,586.98, in reduction of the bases of the securities sold from 1952 through 1955. This resulted in the reduction to that extent of the capital loss carryover claimed by petitioner for 1956.

In its return for the taxable year 1958 the petitioner reported the sale of the 57,000 shares of common stock of Canton Co. of Baltimore for a price of $1,425,000. It reported expense of sale of $34.20, basis of $987,786.13, and a capital gain of $437,179.67 on the transaction.

In its return for the taxable year 1960 the petitioner reported the sale of the remaining 342,500 shares of common stock of Canton Co. of Baltimore for a price of $8,562,500. It reported expense of sale of $142,953.22, basis of $5,939,504.33, and a capital gain of $2,480,042.45 on the transaction.

In the notice of deficiency covering the taxable years 1958 and 1960 the respondent applied $987,786.13 of the net recovery of $12,009,586.98 in reduction of the basis claimed in the return for the stock of Canton Co. of Baltimore sold in 1958, and $5,939,504.33 of such net recovery in reduction of the basis claimed in the return for the stock of such company sold in 1960, thereby reducing the claimed basis of all such stock to zero. The result was that he treated the full amounts reported as having been received in those years from such sales, namely, $1,425,000 and $8,562,500, respectively, less reported expenses of the sales, as capital gains realized upon such sales in those years.

OPINION

The respondent in determining the deficiency for 1956 applied the full amount of the net recovery of $12,009,586.98, received by the petitioner upon settlement of the stockholders' derivative suits against Pennsylvania, in reduction of the bases of the securities sold by the petitioner from 1952 through 1955, and thereby reduced to that extent the amount of the capital loss carryover which the petitioner claimed from those years as an offset against capital gains of 1956. He also reduced the basis of the stock of the Canton Co. of Baltimore, sold

by the petitioner in 1958 and 1960, by $6,927,290.46 of the net amount of such recovery, thereby treating the full amount received upon the sales of that stock in the years 1958 and 1960, less expenses of sale, as capital gain. He concedes that he thus applied, in reduction of basis, more than the net recovery, but states that this was done for purposes of protecting the revenue. On brief it is his present primary contention that the net recovery of $12,009,586.98 should be allocated to each of the investments complained of in the Perrine and Overfield-Weigle suits in the proportion that the adjusted cost basis of each investment on the date of its sale (whether before or after 1952) bears to the aggregate of such adjusted bases, and that the amounts so allocated to the securities sold from 1952 through 1960 should be treated as reductions of the bases thereof for the purpose of calculating the amounts of gain or loss upon such sales. He also set forth on brief alternative methods of allocation.

The petitioner contends that all the investments which were the subject of the Perrine and Overfield-Weigle suits must be considered as a unit, and that since, prior to 1947, it had sustained net losses on sales of some of such investments in an amount in excess of the net amount of $12,009,586.98 recovered in 1947, the entire net recovery should be applied against such unrecovered net losses, and that no portion of such net recovery should be allocated to any of the securities sold during the period from 1952 through 1960 and be used to reduce the bases thereof for the purpose of computing gain or loss upon the sales during the period from 1952 through 1960. It relies upon *Pennroad Corporation*, 21 T.C. 1087, affd. (C.A. 3) 228 F. 2d 329.

In *Pennroad Corporation, supra*, there was presented the question of whether in 1947 the petitioner was in receipt of taxable income as a result of the recovery from Pennsylvania. The respondent had determined that the net recovery should be allocated among four of the investments involved in the Overfield-Weigle suit as to which the District Court had held Pennsylvania to be liable, and in proportion to the awards made by the District Court. The respondent determined that to the extent the amounts allocated to the investments exceeded the bases of the particular securities the petitioner was in receipt of taxable gain. He also held that the amount allocable to the claim for profits derived in the freight-forwarding business constituted taxable income. In that case we pointed out that the judgment of the District Court had been reversed by the Court of Appeals, and disagreed with the respondent's theory of allocating the recovery among only four of the investments complained of in the Overfield-Weigle suit. We noted that the amount paid in settlement applied to all matters involved in both the Perrine and Overfield-Weigle suits. We pointed out that petitioner had sustained losses on those

securities already sold in an amount greater than the recovery, and that it also had suffered losses of many millions of dollars on the remaining securities. We there further stated that the allocation of a portion of the settlement to each investment was unwarranted since the basic nature of the petitioner's claim lay in losses arising from a series of acts of Pennsylvania in furtherance of a continuing conspiracy. Under all the circumstances we concluded that the entire sum received in settlement constituted a recovery of capital resulting in no income taxable to the petitioner.

In affirming our decision in that case the Court of Appeals for the Third Circuit stressed the unitary nature of Pennsylvania's course of conduct and the fact that the amount received by petitioner from the settlement was far less than the capital loss which it had sustained by Pennsylvania's illegal conduct. The court stated that the petitioner was entitled to the "restoration of its capital before the principle of allocation could become applicable."

The petitioner argues that since in the prior case a unitary concept was followed and the respondent's theory of allocation was rejected we should also in the instant case hold that no allocation should be made to any of the securities which were sold from 1952 through 1960. Apparently it reads the opinions in the prior case as requiring that the view be taken here that the net amount recovered is applicable in its entirety to offset losses previously sustained, leaving nothing to be applied against the securities sold in the years with which we are here concerned.

We do not agree that the holding in the prior case precludes an allocation in the instant case of the net recovery and the reduction of the bases of the securities sold. We did not there consider the question here presented, namely, whether for purposes of determining gain or loss upon *sales* of the individual investments, adjustment should be made to the bases of the individual investments because of the net recovery from Pennsylvania.

There are set forth in the margin applicable provisions of the Internal Revenue Code of 1954.[6] Section 1001 provides that the gain from

---

[6] SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. In determining the amount realized—

(1) there shall not be taken into account any amount received as reimbursement for real property taxes which are treated under section 164(d) as imposed on the purchaser, and

the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis and that the loss shall be the excess of the adjusted basis over the amount realized. Section 1012 provides that the basis of property shall, in general, be its cost. Section 1011 provides that the adjusted basis shall be the basis adjusted as provided in section 1016. Section 1016 provides that proper adjustment shall be made to basis for receipts or other items properly chargeable to capital account. The Internal Revenue Code of 1939 contains similar provisions in sections 111(a), 113(a), and 113(b).

Since, as we held in the prior case, the net recovery was a recovery of capital, the statute requires that proper adjustment be made to basis. On brief the petitioner recognizes that this is so but insists that the adjustment is to be made on a unitary basis and that on such a basis the adjustment should be with respect to securities disposed of at a loss prior to 1947, to the exclusion of those disposed of thereafter.

We cannot accept this reasoning. The fact that the various acquisitions of securities were parts of a unitary plan of Pennsylvania certainly does not require the view that the securities must, for all tax purposes, be deemed parts of a single investment. We think that employment of a unitary concept for present purposes would do violence to the statutory scheme of reporting gains and losses on an annual basis. See *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359. It seems to us that adoption of the unitary concept would necessarily

---

(2) there shall be taken into account amounts representing real property taxes which are treated under section 164(d) as imposed on the taxpayer if such taxes are to be paid by the purchaser.

(c) RECOGNITION OF GAIN OR LOSS.—In the case of a sale or exchange of property, the extent to which the gain or loss determined under this section shall be recognized for purposes of this subtitle shall be determined under section 1002.

SEC. 1011. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

The *adjusted basis for determining the gain or loss from the sale or other disposition* of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses)), adjusted as provided in section 1016.

SEC. 1012. BASIS OF PROPERTY—COST.

The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer.

SEC. 1016. ADJUSTMENT TO BASIS.

(a) GENERAL RULE.—Proper adjustment in respect of the property shall in all cases be made—

(1) for expenditures, receipts, losses, or other items, properly chargeable to capital account * * *

preclude the recognition, for tax purposes, of any gains or losses on the sales of the securities until the sale of the last of them, in this case 1960. Cf. *Orvilletta, Inc.*, 47 B.T.A. 10. The petitioner, of course, does not argue for such a result. Indeed, the petitioner itself has treated the various sales as separate transactions and has reported gains and losses in the various years as the sales occurred, including the years in question. We note particularly that the petitioner has carried forward to 1956 the aggregate capital losses on securities sold in the years 1952 through 1955.

It is well established that amounts received in settlement of a lawsuit must be prorated among the various claims settled. See *Helvering v. Safe Deposit & Trust Co. of Baltimore*, 316 U.S. 56; *Commissioner v. Murdoch*, (C.A. 3) 318 F. 2d 414; and *Spangler v. Commissioner*, (C.A. 9) 323 F. 2d 913. The petitioner argues that no allocation should be made since an allocation is impossible or impracticable, referring, by way of analogy, to the line of cases which hold that no allocation of a lump-sum purchase or sale price should be made among individual items purchased or sold where such an allocation would be impracticable or impossible.[7] Suffice it to say that those cases recognize the general rule that an allocation must be made unless it is impossible or impracticable to make an allocation. As will be pointed out *infra*, we think a reasonable allocation is possible and practicable under the circumstances here presented.

In the Perrine and Overfield-Weigle suits claims were made that Pennsylvania was liable for losses occasioned by the payment of excessive prices for the securities and also for losses sustained as the result of the petitioner's continued holding of such securities pursuant to the domination of petitioner by Pennsylvania. The suits did not set forth the specific amount of loss with respect to each investment. Nor did the settlement agreement make any allocation of the amount agreed upon in settlement, but provided that the amount was to be in satisfaction of all claims made in such suits. While the settlement agreement was not executed until 1945, we think it must be concluded that the parties were attempting to settle claims for losses as computed up to the time of the cessation of domination of petitioner by Pennsylvania, and we think the net recovery should be allocated among the investments upon the basis of losses with respect thereto measured as of that time. While the exact time of the cessation of such domination is not shown, it seems reasonable to conclude that it was on or about the date of expiration of the voting trust, which was about May 1, 1939. The parties have stipulated ledger values, as of December 31, 1938, based primarily upon market quotations, of

---

[7] *William T. Piper*, 5 T.C. 1104; *Inaja Land Co., Ltd.*, 9 T.C. 727; *United Mercantile Agencies, Inc.*, 23 T.C. 1105, remanded on another issue sub nom. *Drybrough v. Commissioner*, (C.A. 6) 238 F. 2d 735; and *Hamilton & Maine, Inc.*, 25 T.C. 878.

the securities which the petitioner continued to hold on that date. While it has not been shown that this was the precise date of cessation of control by Pennsylvania, we think it cannot be too remote from the actual date of cessation. In our opinion the ledger values as of December 31, 1938, afford a satisfactory basis for determining the losses (on securities held on that date), claims for which were settled by the settlement agreement,[8] the loss in each instance being the difference between the original cost [9] and the reduced ledger value as of December 31, 1938. Any actual losses sustained on investments sold or charged off prior to December 31, 1938, were, of course, known to the parties at the date of settlement. We think that such losses must be considered as the measure of the losses as to those investments which were the subject of the settlement agreement. The loss on the sale of a portion of the stock of Lehigh Valley Railroad Co. in 1937 is the stipulated loss of $340,599.43, and the loss on the investment in National Freight Co. is the amount of $3,852,000 which was charged off during 1934 and 1936. Since on the sale of the stock of Raritan River Railroad Co. in 1931 no loss was sustained (there was a gain) no part of the net recovery in 1947 will be attributed to that investment. It may be added that we do not consider that the underwriting fees of $5,251,586 incurred in 1929 in the issuance of voting trust certificates of petitioner are a factor in making the allocation. Although the proceeds of that issuance of trust certificates were used in part to purchase stock of Pittsburgh & West Virginia Railway Co., such underwriting fees are not to be considered as a cost of such stock.

Accordingly, the net recovery of $12,009,586.98 will be allocated to the various investments made by petitioner while under the domination of Pennsylvania (irrespective of when sold or charged off) in proportion to the losses determined as above stated.[10] There remains,

---

[8] As stated in *Helvering* v. *Safe Deposit & Trust Co. of Baltimore,* 316 U.S. 56, a high degree of precision is often impossible to achieve in the decision of tax problems, and it is far better to make such an estimate as the data will permit than to completely ignore the realities of a compromise because of difficulties of evaluation. See also *Levine* v. *Commissioner,* (C.A. 3) 324 F. 2d 298.

[9] In the case of Detroit, Toledo & Ironton RR. Co., the cost is to be reduced by the amount of $3,975,487.57 representing bond interest accrued but unpaid at the date of purchase, with the result that there will be no difference between the cost and the ledger value as of December 31, 1938, and hence no loss.

[10] This method of allocation follows to some extent the third alternative method of allocation set forth by the respondent on brief. However, such alternative method is based upon losses determined as of the date of settlement, Feb. 19, 1947, which is, of course, over 8 years after the termination of the voting trust and at least 8 years after the cessation of Pennsylvania's domination of petitioner. We think the losses computed as of that time would not be a true measure of the liability of Pennsylvania which was settled. In this connection it should be noted that the settlement figure of $15 million was actually agreed upon by the litigants on Mar. 2, 1945, and therefore could not have taken into account losses computed as of Feb. 19, 1947.

It should be added that we see no merit in the allocation of the net recovery in proportion to adjusted bases of the securities at times of sales, as primarily urged by the respondent. The adjusted bases are, substantially, the original costs, and it would not be logical to conclude that the losses sustained on the investments were in direct proportion to the costs of the investments. Cf. *Orvilletta, Inc.,* 47 B.T.A. 10.

234

of course, the matter of further apportioning among the securities sold during the years 1952 to 1960 the amount allocated as above set forth, but this is merely an arithmetical computation based upon the number of shares sold in each of the years. The amounts so apportioned will be applied in reduction of the bases of the securities sold during the period 1952 through 1960 and will thus be reflected in the computation of the gain or loss resulting from the sales.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*